[No. G033421. Fourth Dist., Div. Three. Apr. 27, 2004.]

JENNIFER A., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in Interest.

1324

**COUNSEL**

Deborah A. Kwast, Public Defender, James Steinberg, Assistant Public Defender, Dennis M. Nolan and Paul DeQuattro, Deputy Public Defenders, for Petitioner.

No appearance for Respondent.

Benjamin P. de Mayo, County Counsel, and Mark R. Howe, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Craig E. Arthur for Real Parties in Interest Christian A. and James C.

## Opinion

## FYBEL, J.—

### Introduction

Petitioner Jennifer A. (Mother) is the mother of Christian A. and James C. (the children). Christian, now seven and a half years old, and James, now three years old, were placed in protective custody in July 2002. By petition filed pursuant to rule 39.1B of the California Rules of Court, Mother seeks relief from the juvenile court's order terminating reunification services and setting a hearing under Welfare and Institutions Code section 366.26 to consider a permanent plan and the termination of parental rights.[1] (All further statutory references are to the Welfare and Institutions Code.) The section 366.26 hearing is scheduled for May 3, 2004. We hold substantial evidence does not support the finding that returning the children to Mother's physical custody would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the children. We therefore grant the petition and issue the writ.

In July 2002, the Orange County Social Services Agency (SSA) detained the children after Mother, a single parent, left them alone in a motel room while she went to work. As early as the six-month hearing, Mother's social worker and therapist recognized Mother was " 'far removed' " from leaving the children at home alone again, had learned proper parenting skills, and had accepted responsibility for the circumstances that brought the children into the juvenile court's custody. At the 12-month review hearing, the parties stipulated there was a "substantial probability" the children would be returned to Mother's physical custody within six months.

The differences between this case and the usual dependency case that has reached the point of a permanency hearing are striking. Mother not only has been employed in a responsible position since before these proceedings began, but since then, she has received a promotion. There is no evidence either Mother or Father ever physically or emotionally abused the children, other than the July 2002 incident leading to their detention. There is no evidence Mother cannot provide adequate living conditions. There is no evidence she has a mental illness or physical impairment affecting her parenting skills. Mother has never been incarcerated. She substantially complied with her reunification plan, has completed parenting courses and counseling, has completed drug treatment, and knows proper parenting behavior. Mother always acted appropriately with the children during visits.

---

[1] James C., Sr. (Father), is the father of both Christian and James. Father does not challenge the juvenile court's decision. Our opinion applies only to Mother.

The relationship between Mother and the children has always been close, loving, and that of parent and children.

What brought these proceedings to the point where Mother faces permanently losing her children? Over a period of one and one-half years in which Mother was required to submit twice weekly to random drug testing, she missed about nine tests, was unable to void a few times, tested positive for alcohol in November 2002 (for which she underwent treatment), and tested positive for marijuana in August 2002 and in December 2003. The social worker expressed concern Mother might have an "unresolved substance abuse problem" and might have avoided drug testing. Mother ultimately conceded she does occasionally smoke marijuana.

However, the evidence did not link substance use or abuse with Mother's lapse of judgment in leaving the children at home alone. The petition did not allege substance abuse as a ground for detention. Mother completed about 84 drug-free tests and was unable to void once, which is, we believe, sufficient compliance with the case plan to avoid termination of parental rights under the circumstances of this case. Mother was never subject to clinical evaluation and was never diagnosed as having a substance abuse problem. No medical professional testified at the 18-month review hearing. The social worker testified Mother did *not* have a substance abuse problem affecting her parenting skills. The social worker confirmed Mother has good parenting skills and testified "she pretty much does those things that we normally associate with good parenting."

Unable to present a case of substance abuse, SSA continues to pursue termination of parental rights on the theory Mother's positive marijuana test is one of a series of events, starting with the incident leading to the children's detention, that are indicative of poor judgment. Yet, for both the six-month review report/hearing and the 12-month review report/hearing, SSA stipulated there was a substantial probability the children would be returned to Mother's physical custody. Mother substantially complied with her reunification program and long ago resolved the issue that led her to leave the children unattended. The only significant event occurring after the 12-month review was the December 2003 positive marijuana test. At oral argument, counsel for SSA agreed that the one positive test alone would not justify termination of parental rights. Minors' counsel, though requesting denial of the writ petition, stated at oral argument this was a close case and expressed optimism over family reunification.

The question we face is not whether Mother has an unblemished drug testing record or whether Mother is a perfect parent. Rather, the question is

whether substantial evidence supports the juvenile court's finding that returning the children to Mother's custody would create a substantial risk of physical or emotional detriment to the children. Substantial evidence does not support such a finding

In reaching our conclusion, we are guided by the Legislature's directive that "[t]he focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (§ 300.2; see *In re Kieshia E.* (1993) 6 Cal.4th 68, 79 [23 Cal.Rptr.2d 775, 859 P.2d 1290] ["the law's strong support for preservation of the parent-child relationship, even in the face of dangerous parental misconduct"]; *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 704 [71 Cal.Rptr.2d 780] [" ' "The focus during the prepermanent planning stages is preserving the family whenever possible" ' "]; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1010 [70 Cal.Rptr.2d 603] ["Family preservation is the first priority when dependency proceedings are commenced"].) This legislative mandate supports our granting the petition and issuing the requested writ.

FACTS AND PROCEEDINGS IN THE JUVENILE COURT

I. *Protective Custody and Detention of the Children*

In July 2002, five-year-old Christian and 18-month-old James were taken into protective custody after being found unattended in an Anaheim motel room. A motel employee discovered the children while locking out Mother for nonpayment of rent.

Anaheim police officers arrived and interviewed Christian. He told the police, " 'Mommy left for work early this morning and won't be back till the night time.' " When asked who fed him during the day, Christian replied, " '[n]obody.' " When asked who fed James and changed his diaper, Christian replied, " 'Mommy does when she gets home.' " James was found in a travel playpen.

The officers found bottles of Tylenol, Tylenol with codeine, and other drugs in a lower, unlocked cabinet. They found a gallon of ammonia on the bathroom floor. A hot plate was within Christian's reach. The food in the upper cupboards was too high for him to reach.

The officers could not wake up James and became concerned he had been drugged. Medics arrived and determined James's vital signs were normal. James was taken to a hospital emergency room, where he was noted to be

alert and hungry. Initially, James was assessed as dehydrated and malnourished, but later it was determined the original laboratory work was incorrect and James was healthy. No marks or bruises were found on James.

Mother is employed as an underwriter for a loan company. The officers contacted mother at her work in Irvine and directed her to return to the motel.

When Mother arrived at the motel, she explained that she had left the children at 7:45 a.m. to go to work. She said Father was supposed to care for them, and she " 'though[t] he would be there any minute.' " Mother said James had been sick with diarrhea for three weeks due to teething issues.

A neighbor told police she believed the children had been left alone for the last three weeks. The neighbor said she had heard Mother leave the room about 7:00 a.m. and return at night, usually around 11:00 p.m. The neighbor had not seen the boys alone.

Father arrived at the motel at noon. Father claimed he was late because his car had broken down on the way from Compton and he had to take the bus.

The police officers concluded the children had been alone for at least two hours and arrested Mother for child endangerment. At the time of her arrest, Mother informed the officers she had marijuana in her purse. A one-gram bag of marijuana was found in Mother's purse.

The children were detained and placed at Orangewood Children's Home (Orangewood). The social worker interviewed Christian soon after he was placed at Orangewood. When asked what happened before he was taken to Orangewood, Christian replied, " 'I was taking care of my brother when my mom went to work and I am five years old.' " When asked what he eats during the day, Christian replied, " 'My mom cooks.' " Christian said that in an emergency, he would call the " 'firemen,' " but replied " '[n]o' " when asked if he knew how to call them. (The police officers noted the motel room had no telephone.) Christian stated he usually went to school when Mother worked and he had watched James on only one occasion. Christian denied being physically abused by his parents, but mentioned Mother spanked James when he cried. Christian also denied any domestic violence in the home.

About one week later, Christian told the social worker he wanted to be returned to Mother and he was not afraid when she left him alone. Christian also told the social worker he had been left alone three times in the motel room, but then said that when Mother was working, a babysitter looked after him.

Both Christian and James received "well child" exams at Orangewood and were reported to be in good health. The children appeared to be developing at age-appropriate levels. The Orangewood staff reported Christian and James were "very bonded" and " 'attached at the hip.' " Mother visited regularly. Father did not visit.

On August 26, 2002, the children were placed with the paternal grandmother. While the children were at Orangewood, Mother was permitted unmonitored visitation; when the children were moved to the paternal grandmother's home, a monitor was imposed on her visits.

Mother missed her first two appointments with the social worker. When they did meet, Mother stated that the night before she left the children alone, she had spoken with Father and he assured her he would be there the next morning to watch them. Mother said she left for work at 7:45 a.m. because she believed Father would be there soon. Mother claimed that whenever she was unable to arrange child care, Father was " 'always there' " to watch Christian and James. According to Mother, at 10:00 a.m. on July 19 Father (who was unaware the children had been left alone) called Mother at work to say he was not at the motel yet, but would be right there. Mother explained the situation to her supervisor, who told Mother she could leave when she finished the file she was working on. Mother stated, " 'So, I'm finishing the file and the police call and said they were there with my kids.' " Mother acknowledged, " 'I'm not innocent of leaving [the children] alone that day. I made a gamble with their lives rather than my job.' "

Mother denied the children previously had been left at home alone. She also denied abusing substances, but admitted she occasionally smoked marijuana. Mother denied drinking alcohol or abusing other drugs.

The detention order required Mother to submit to drug testing. On August 29, 2002, Mother tested positive for marijuana. Mother had been forgetful about scheduling drug testing until then, and the social worker expressed concern over Mother's attitude.

## II.  The Dependency Petition and Service Plan

The juvenile dependency petition, filed on July 23, 2002, alleged, pursuant to section 300, subdivision (b), the children were at risk of suffering serious physical harm, illness, or neglect based on Mother's failure to protect them. The basis for the allegations was Mother had left the children alone in a motel room on July 19, 2002, and on "other, unspecified occasions" without food and water and with access to harmful substances. The detention report

expressed the same concerns. The petition had a second count alleging no provision for support. (§ 300, subd. (g).)

Mother pleaded no contest to the petition. Father submitted "through counsel."

On September 5, 2002, the juvenile court sustained the allegations of count 1 of the petition, dismissed count 2 on county counsel's motion, declared the children dependents of the juvenile court, removed custody of the children from Mother, and vested custody with SSA. The court approved the SSA-recommended service and visitation plan. The plan's goal was reunification, and the plan required counseling, a parenting program, and twice-weekly drug testing with observed specimen collection. A missed test would be treated as a positive test, and a positive test or missed test would require Mother to complete an SSA-approved outpatient substance abuse program.

### III.   Six-month Status Review Report and Hearing

By the time of the six-month review hearing on February 25, 2003, Mother had pleaded guilty to two counts of child endangerment and was reporting to a probation officer twice a month. Mother was in compliance with the terms of her probation.

Mother remained employed with the same company as a quality control underwriter. She had completed an 18-hour parenting course and the counseling component of the service plan. Mother's therapist reported Mother had not missed any sessions and was " 'motivated to complete this program.' " The therapist reported that Mother was " 'far removed from ever leaving children unattended,' " had " 'learned proper parenting and boundaries of protecting the children,' " and " 'wants her children back and constantly communicates that.' "

However, Mother had missed "a number" of drug tests (the record does not disclose the precise number) and tested positive for alcohol on November 6, 2002. As a result, Mother was required to undergo drug treatment, and she enrolled in a program on February 10, 2003. In the six-month status review report, the social worker expressed concern that Mother "may have an unresolved substance abuse problem." Nevertheless, the social worker was "guardedly optimistic" the children would be reunited with their parents.

By the time of the six-month review report/hearing, Mother was having unmonitored visits with the children. The visits were going well and the children were enjoying them. Father was having monitored visits with the children, and those visits were also going well.

In the six-month status review report, the social worker wrote that both parents stated they "accept responsibility for the circumstances that caused the children to be brought into custody." Mother and Father stated they were working together to ensure the children's "future safety and protection."

All parties stipulated the parents had made substantial progress toward alleviating or mitigating the causes necessitating placement. The court scheduled a 12-month review hearing for August 11, 2003.

## IV. Twelve-month Status Review Report and Hearing

The 12-month status review report, filed August 11, 2003, reported the children had been placed in Mother's home on June 12, 2003, for a 60-day trial visit, but were removed on July 23 based on reports of " 'domestic violence' " and an unauthorized caretaker. The " 'domestic violence' " turned out to be an incident in which Mother had a heated argument over the telephone with Father and Father's girlfriend. The children were in the next room and overheard the argument. After the argument, Mother comforted the children and told them it would never happen again. In a later interview, Christian told the social worker he heard his mother scream loudly two or three times and it scared him. Christian said Mother apologized to him and assured him that " 'she felt bad and was sorry.' "

During the 60-day trial visit period, the maternal grandmother watched the children while Mother was at work. On July 22, 2003, Mother told the social worker the maternal grandmother had gotten a job and the children were being watched by a friend. The social worker reminded Mother a condition of the placement was the maternal grandmother would provide daycare and SSA had to clear anyone else. Mother responded the arrangement was only temporary and she had contacted a licensed caretaker regarding a long-term arrangement. The social worker made an unannounced visit to Mother's home on the same day. The woman caring for the children identified herself as Melissa Morgan. She said was 21 years old and had known Mother for about two years. When asked if she had been arrested or convicted of any crime, Morgan first responded she had only been arrested for a traffic violation. When pressed, Morgan said she had been arrested "for drugs" two or three years previously, " 'but it was taken care of.' " She declined to elaborate.

During the same visit, the social worker asked Christian whether Father ever spent the night. Christian responded Father slept at the home, in the bed with Mother " 'a lot of nights.' " Father's visitations were required to be monitored, and Mother was not authorized to serve as the monitor. Mother previously told the social worker she was not romantically involved with Father.

When Mother arrived home, the social worker confronted her with Christian's claims that Father had spent the night. Mother insisted Christian was mistaken; she claimed Father at times would stay at the home until late at night and return early the next morning. Mother stated she was aware of Morgan's previous arrest, but that Morgan " 'told me she took care of it.' "

The social worker concluded the children were at risk of "further abuse" and removed them from Mother's home. Removal caused the children distress. At the social worker's request, Mother cooperated in removing the children by transporting them to the paternal grandmother's home.

On July 24, 2003, Mother called the social worker in a "frantic tone" of voice and requested he obtain a restraining order against Father. On the same day, the paternal grandmother called the social worker and requested the children be removed immediately. The paternal grandmother reported that Mother yelled at her on the telephone. The grandmother stated she would no longer be able to care for the children due to Mother's "acrimonious attitude." The grandmother revealed there had been numerous arguments between Mother and Father in front of the children. At Mother's request, the children were returned to the maternal grandmother's home. Mother had been living with the maternal grandmother to cut expenses, but moved out so the children could live there.

The 12-month status review report included this statement made on January 21, 2003, by Mother's former therapist: " '[Mother] has had some recognition at work and she is very excited. Also the children's father has shown an interest in her so she is feeling like she is accomplishing positive growth.' " The social worker concluded the therapist's statement was consistent with his belief that Mother "may be more concerned with her relationship with [Father] than protecting the children from further harm."

On January 24, 2003, Mother completed individual counseling at Olive Crest Treatment Center. Her counselor reported, "[h]er parenting knowledge has improved and she feels better about being a mother." Mother had a perfect attendance record and " 'was always on time and ready to deal with her case plan.' "

On February 10, 2003, Mother enrolled in a perinatal program. On May 16, 2003, Mother's perinatal counselor reported Mother had experienced difficulty in attending her focus group. The counselor also reported the recovery group facilitator had stated: " '[Mother] participates very well in the . . . group and makes relevant comments pertaining to the topic discussed. In addition, [Mother] appears willing to participate in the program and seems to be open to the group discussions. However, she has stated several times

that she does not have an alcohol or drug problem and, therefore, is struggling with being able to fully relate to the information offered about alcohol and drug abuse. It is hoped that client will avail herself of the help offered and begin to gain insight about the consequences of even minor drug or alcohol abuse and its potential negative impact on individuals and their families.' "

On March 4, 2003, Mother told the social worker she was " 'having trouble getting motivated' " and had missed some tests because of despondency over the dependency case. The social worker received confirmation Mother did not report for drug testing on February 13, 18, 24 and 27, and March 3, 2003. On April 18, 2003, mother's perinatal counselor reported that although the situation had improved, Mother had missed " 'a couple of counseling sessions because she was over five minutes late.' " The counselor reported Mother was " 'doing very well with sharing and is attentive to others.' "

On May 22, 2003, Mother's perinatal counselor reported Mother had missed seven of nine focus group meetings and had declined to change her schedule although she had been offered a different date and time for meetings. Mother was given an ultimatum and signed a contract calling for her termination from the program if she missed any more sessions without a valid excuse. The social worker received no further reports of noncompliance.

In the 12-month status review report, the social worker acknowledged Mother "has demonstrated to her therapist and her parent education instructor that she has incorporated 'good' parenting skills into her lifestyle." The social worker stated he "has a number of concerns regarding [Mother]'s successful internalization of those behaviors needed to protect the children from further abuse." The social worker also was concerned that Mother may have an unresolved substance abuse problem and that Mother had engaged in "domestic violence" in the children's presence, left the children with an unauthorized caretaker with an arrest/record for drugs, and had allowed Father to have unmonitored access to the children. But with respect to case plan compliance, the report concluded: "[M]other is in general compliance with the terms of her case plan for reunification with the children. She has successfully completed counseling and parent education components, is employed, has adequate housing, and is reported to be in compliance with the terms of her probation. [¶] However, [Mother] is not in compliance with her case plan requirement that she submit twice weekly to random drug-alcohol testing. . . . [¶] . . . [M]other has missed a number of drug tests and on at least four occasions has requested that the undersigned and/or other Social Services Agency staff fax over permission for same day testing due to her failure to schedule appointments as required. Additionally, on November 8, 2002, the undersigned was notified that [Mother] had tested positive for alcohol use on November 6, 2002."

At the 12-month review hearing on August 26, 2003, the parties stipulated there was "a substantial probability" the children would be returned to Mother's physical custody within six months. The parties also stipulated "some progress" had been made toward alleviating or mitigating the causes necessitating placement. The matter was continued to January 12, 2004, for an 18-month review hearing.

V. *Eighteen-month Status Review Report*

The 18-month status review report, filed on January 9, 2004, reported the children still lived with their maternal grandmother. Mother remained employed in the same job and was sharing an apartment with a roommate. Father had had little contact with the social worker and, so far as the social worker was aware, had not participated in the case plan.

On December 3, 2003, Mother informed the social worker she would not be able to undergo a drug test due to scheduling conflicts. The social worker insisted Mother test. Mother tested positive that day for marijuana. The social worker believed Mother had been trying to avoid testing due to her drug use.

In addition, Mother missed drug tests on August 11, October 6 and 20, and December 1, 2003. Mother was unable to void on September 11, and gave diluted specimens on June 23 and 26, August 18 and 28, and December 10, 2003. When the social worker asked Mother about the December 10 diluted specimen, Mother replied she had drunk a lot of water so she could void. When the social worker asked about the positive test for marijuana on December 3, Mother said she wanted to speak with her attorney regarding the matter.

Mother's perinatal counselor reported that Mother had completed the last phase of her parenting group and was ready to begin "Phase IV, Relapse Prevention." The counselor reported Mother had to make up some missed focus group sessions and expressed concern over Mother's drug testing. The counselor said Mother had denied using drugs, but "intimated" she had been around people who used drugs. Mother assured the counselor she would attend recovery group sessions to learn how not to be around people who use drugs, but failed to appear for the first session.

The social worker recommended reunification services be terminated and a section 366.26 selection and implementation hearing be held. Although the social worker found Mother was in general compliance with her case plan, "there have been several areas of recent noncompliance that cause the undersigned to seriously doubt [Mother]'s ability to separate her needs and wants from the need for the children to be raised in a protected and safe

environment." Specifically, the social worker explained: "[Mother] has, in the past, left the children with an unapproved caretaker, who admitted a previous arrest record for drug use, causing the undersigned to prematurely terminate a sixty-day home visit. Of greater concern is her recent positive test for marijuana use, a clear violation of her case plan requirements. Also, based upon her probation officer's reporting, she is in violation of the terms of her probation. The drug use violation is significant in that the children's mother has continued to deny drug use since the children were brought into custody." The social worker believed "[t]he children's mother appears to continue to have an unresolved substance abuse problem."

## VI. *Eighteen-month Review Hearing*

The social worker and Mother testified at the 18-month review hearing on January 12, 2004.

### A. *The Social Worker's Testimony*

The social worker testified Mother generally was in compliance with the case plan, had kept appointments, responded to comments, and kept him informed of pertinent changes. Mother had daily, unmonitored visits with the children, her interactions with them were "appropriate," and they were happy to be with her. The social worker testified that Mother had "consistently stated to me and impressed upon me . . . that she wishes to be reunited with the children." He believed the children were "fairly dedicated" to Mother, and Mother appeared to be "greatly concerned" about the children's welfare.

The social worker reported that Mother received good reviews from the parenting class instructor and that Mother "pretty much does those things that we normally associate with good parenting." The social worker testified he had seen Mother interact with the children and believed she possessed good parenting skills. Mother was due to graduate from her perinatal course within a matter of weeks or even days when she completed a couple of make-up courses. Mother had made progress in her individual counseling and had not missed any sessions with her therapist. Mother continued working full-time in the position she had had since September 2002. Mother was only "days away from having the children" when she tested positive for marijuana.

The social worker expressed concern over the issue of drug use and whether Mother had "a drug problem." When asked why he did not believe the children should be returned to Mother, the social worker testified, "as a social worker, we have to deal with the issues that brought the children into custody. And to a great extent I think this case re[v]olves around dope. The issue of drug use and abuse is critical, it is essential to whether or not these

children are adequately protect [*sic*] them. [¶] And the mother more or less contends that she does not have a drug problem, and that's in spite of the fact that even with a positive test the mother says she doesn't have a drug problem. And her participation in the program activities, [with] specific reference to the drug testing has been more—it's just like dragging her to it. She's just resistant all the way." The social worker concluded, "So I don't know that she has successfully addressed the issues that caused the children to be brought into custody."

When asked if the parenting class instructor ever shared any concerns that mother might be "arriving or participating in the program" while under the influence of drugs or alcohol, the social worker responded, "[n]ever." He also testified that in the course of his many contacts with Mother, she never seemed to be under the influence of any kind of intoxicant. With respect to the diluted tests, Mother had informed the social worker her perinatal counselor had advised the program participants to drink lots of fluids so they could void. The social worker had checked with the counselor, who verified Mother's claim.

The social worker testified he believed Mother had tried to avoid drug tests. He explained he worked with Mother's perinatal counselor to set up a test schedule around Mother's work schedule. On the first day of the new schedule, Mother called to say she could not test. The social worker advised Mother she had to test, and the test returned positive for marijuana. At first, Mother claimed she had not smoked marijuana, but was in "the wrong place at the wrong time." Later, Mother told the social worker she would not answer his questions and "defer[red] any comments to her attorney."

The social worker testified he considered drug use an "impediment to proper parenting" and expressed concern Mother was not accepting responsibility for the positive test. He testified Mother resisted drug testing and "continually stated that she does not have a drug problem." However, the social worker testified he made no changes to Mother's visitation schedule following the positive marijuana test in December 2003 because he "didn't see any danger to the children based upon that one positive test." He added, "[t]hat may have been an oops on my part." Of greater concern to the social worker was the fact Mother failed to show up for the initial recovery relapse component meeting after agreeing to attend. This indicated Mother appeared not to be accepting responsibility for using drugs.

The social worker testified he personally viewed marijuana differently than other substances. He testified he believed Mother did not have a drug problem that affected her parenting skills. Mother had the "ability to function in her life. She's going to work; she's taking care of her kids; she takes them

to places they need to [be] taken to; she expressed a genuine interest in their welfare." But, the social worker testified, "as an agent of the county, it's my responsibility simply to monitor what the court has ordered to be monitored. . . . [¶] . . . [T]hen I have an independent responsibility—independent of how I might personally feel about it—to report to the court that she has or has not done so."

The social worker also expressed concern over Mother permitting Father to have contact with the children. He testified both the paternal and maternal grandmothers had commented that Mother was more interested in her relationship with Father than in "doing what was right for the children."

With respect to the incident when Morgan served as the children's caretaker, the social worker testified he felt uncomfortable questioning Morgan, and ultimately let the matter drop.

## B. *Mother's Testimony*

Mother testified she saw the children, who lived with her own mother, on a daily basis. Mother helped Christian with his homework, played with the children, and sometimes made their meals. Mother testified Christian is doing well in school. Mother took the children with her when she ran errands, and took them to the park and to the movies.

Mother testified she worked as a quality control underwriter and had worked for the same employer for one year and nine months. In October 2002, Mother was promoted from junior underwriter to quality control underwriter.

Mother testified she learned in parenting class to discipline through teaching rather than punishment and to modify her parenting skills to be a positive role model for the children. Through counseling, Mother learned to use "better judgment in the safety and well-being of my children." Mother testified she was in the fourth of four phases of the perinatal program.

Mother testified about the telephone argument with Father in July 2003. Mother explained she had been romantically involved with Father, but that relationship ended about the time of the telephone argument. Mother described the argument as heated. Afterwards, Mother calmed Christian; she "acknowledged his feelings," apologized, and "assured him everything was okay, that mommy was just upset and that everything will be fine." When asked if she believed there would be any more "verbal fight[s]" with Father, Mother replied, "I have modified . . . my behaviors because of being enrolled

in the parenting program. I've reduced expectations of [Father] and I don't associate with him because my children—my relationship with my children is more important."

According to Mother, Father did not use drugs, was never violent with the children, had never hit her, and wanted to reunify with the children. Mother conceded that she let the children see Father without a monitor present and that she failed to inform the social worker Father had spent one night with her while the children were on trial release. She knew Father was permitted only monitored visits and she was not authorized to be the monitor.

Mother admitted she had smoked marijuana in December 2003, causing the positive test. Mother testified she believed she did not have a drug problem and claimed that before December 2003, she had not smoked marijuana since August 2002. Mother testified the marijuana use in December 2003 resulted from "a temporary lapse in judg[]ment." She stated, "soon after, I realized the mistake I had made. I removed myself from that situation and . . . tried to redeem myself." Mother conceded she failed to inform the social worker of the marijuana use.

Mother was asked whether she believed marijuana use impaired her ability as a parent. She responded: "If I was a marijuana addict and I was using continuously, yes. But since it was an isolated incident, no, I don't believe so." Mother testified the children were staying with their maternal grandmother when Mother used marijuana in December 2003. She testified she would never use marijuana around the children and believed using marijuana around children is "a terrible thing." Mother claimed she had never smoked marijuana in front of the children and no longer associated with drug users.

With respect to the missed drug tests, Mother claimed that "sometimes it was a conflict with my employment." Her current position is "very demanding" of her time and a longer commute made it more difficult to keep testing appointments.

Mother testified Morgan watched the children only once. The maternal grandmother usually looked after the children, but on that day she had a job interview. The maternal grandmother was trying to get a job "so we can work together and have a dual income." Mother conceded she did not inform the social worker that Morgan would be watching the children until the day of the maternal grandmother's job interview. Mother told the social worker the children were safe, the arrangement was only temporary, and Mother had contacted a licensed caretaker to provide long-term care. Mother claimed she did not believe Morgan was an "active current drug user." Morgan also was watching her own son and another child, and those children appeared to be

well cared for. Mother knew Morgan was not authorized to watch the children, but "thought that she would be okay" because Morgan said she had completed a perinatal program.

Asked why she had missed the first recovery group meeting, Mother replied she believed she had worked late that evening. Since then Mother had attended the recovery class and progressed to the next stage.

Mother testified she loved the children very much. When asked whether the children would be well cared for if returned to her custody, Mother responded, "I believe that with every soul my being [*sic*] while I'm sitting here, yes."

## C. *The Juvenile Court's Ruling*

After hearing the testimony and counsel's arguments, the juvenile court concluded the return of the children to Mother would create a substantial risk of harm to their physical and emotional well-being. In reaching this conclusion the court explained: "The court does not . . . render a decision based on the presence or absence of the either [*sic*] a technical violation or compliance. Certainly compliance is of great interest. [¶] What is presented . . . here is an individual who is articulate, who . . . functions in a business world, business setting. The court is troubled by the pattern that has been presented her[e] of testing history: the missed test and the diluted tests. The court is also concerned in terms of other episodes dealing with the caretaker and with the father. [¶] The report and the testimony of the social worker I think reflected a thoughtful or reflective submission. And the concern here is with Mother's ability to comply, putting the needs of her children at the front, knowing and understanding that her compliance is going to be examined, monitored. And in fact, there are failings, there are failures. [¶] The court . . . would note there is evidence with reference to the caretaker and other circumstances, which would be extant if the court would return the children to Mother . . . . However, the court relies primarily and indeed focuses on the evidence that has been brought forward by the county counsel's office . . . with reference to the history of the mother during the last reporting period, from the 12-month[] to the 18-month period."

The juvenile court ordered reunification services terminated and set a hearing pursuant to section 366.26. The court found "continued placement is appropriate and necessary, that there has not been substantial progress made toward alleviating or mitigating the causes necessitating placement, that there has not been substantial compliance with the service plan."

ANALYSIS

Section 366.22 provides that following the permanency review hearing, "[t]he court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a).)

The juvenile court found return of the children to Mother's custody would create a substantial risk of detriment to the physical or emotional well-being of the children. The juvenile court found that Mother had not made substantial progress toward alleviating or mitigating the causes necessitating placement and had not substantially complied with the service plan. We determine whether substantial evidence supports the juvenile court's findings. (*Constance K. v. Superior Court, supra,* 61 Cal.App.4th 689, 705.) We conclude substantial evidence does not support the findings.

### I. *Compliance with Reunification Plan*

#### A. *Regular Compliance*

█ We start with the juvenile court's finding regarding Mother's compliance with her case plan. Compliance with the reunification plan, though not determinative, is a pertinent consideration at a section 366.22 hearing. (*Constance K. v. Superior Court, supra,* 61 Cal.App.4th at p. 704; *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1139–1140 [63 Cal.Rptr.2d 269].) "In determining whether it would be detrimental to return the child at the 18-month review, the court must consider whether the parent participated regularly in any treatment program set forth by the plan, the 'efforts or progress' of the parent, and the 'extent' to which the parent 'cooperated and availed himself or herself of services provided.' [Citation.]" (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748 [53 Cal. Rptr. 2d 687].) "The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental." (§ 366.22, subd. (a).)

As of the date of the 18-month review hearing, Mother had completed the 18-hour parenting course and had completed individual counseling. Her therapist reported she had missed no sessions. Mother was permitted daily, unmonitored visits with the children. As early as the six-month review, Mother's therapist reported that Mother was " 'far removed from ever leaving children unattended.' " Mother had enrolled in a perinatal program, and, although she had "missed sessions" (apparently because she was over five

minutes late), by the time of the 18-month review hearing she had made up all but a few sessions. Mother had completed the third phase of her parenting group and had begun the final phase. The social worker testified Mother was in general compliance with her case plan, had kept appointments, responded to comments, and kept him informed of pertinent changes.

As the juvenile court noted, there were failures. The court considered Mother to be noncompliant in four areas: (1) the incident of "domestic violence," (2) permitting Father to have unmonitored visits, (3) permitting Morgan to take care of the children while Mother was at work, and (4) missing, "diluted," and positive drug tests.

■ The first concern—the report of "domestic violence"—does not withstand analysis. A heated argument over the telephone, without more, is not domestic violence, and characterizing it as such trivializes true acts of domestic violence. The record does not reveal what actually was said during the argument. There is no evidence of threats. After the telephone argument, Mother actively and appropriately comforted the children, a positive display of parenting skills.

Second, permitting Father to have unmonitored visits was a violation of the case plan, but there are no reports of unmonitored visits occurring after July 2003. There was never any claim or evidence that Father abused the children or posed a threat to them.

Third, only one incident was reported of Mother leaving the children with an unauthorized caretaker. Although Morgan had been arrested for drugs two or three years before, there was no evidence she was using drugs at the time she cared for the children and no hint that she was not an adequate caretaker. The social worker let the matter drop. In the 12-month status review report, which covered the period during which Father allegedly made unmonitored visits and Morgan looked after the children, the social worker concluded Mother was in general compliance with the terms of the case plan and the parties stipulated there was a substantial probability the children would be returned to Mother's physical custody within six months.

The fourth area is the real noncompliance issue—the missed, diluted, and positive drug tests. After the reunification plan imposed the twice-weekly regimen, Mother tested positive for alcohol on November 6, 2002. As a result, Mother was required to, and did, enroll in a drug treatment program. There is no evidence she did not complete the program. Mother tested

positive for marijuana on December 3, 2003.[2] She missed drug tests on February 13, 18, 24 and 27, March 3, August 11, October 6 and 20, and December 1, 2003. She was unable to void on September 11, and gave diluted specimens on June 23 and 26, August 18 and 28, and December 10, 2003.

■  Drug testing is an important component of the reunification plan, and we must consider the missed tests to be positive tests. But in considering whether Mother is in compliance with her case plan, we must place the number of missed tests in perspective. Mother was required to undergo twice-weekly random drug testing. As Mother points out, from February 13, 2003 (the date of the first missed drug test), to January 12, 2004 (the date of the 18-month review hearing), Mother had, under the twice-weekly regimen, 95 testing obligations. True, Mother missed nine tests, was unable to void once, gave diluted specimens five times, and tested positive for marijuana once—this record does not constitute strict compliance with the case plan. But completing about 84 drug-free tests (including providing diluted specimens five times) and being unable to void once is, we believe, sufficient compliance with the plan under the circumstances of this case to avoid termination of parental rights. As for the diluted tests, Mother's therapist confirmed Mother's explanation that Mother was told to drink a lot of fluids so she would be able to void for the test.

■  Mother was not required to demonstrate perfect compliance. (*Dawnel D. v. Superior Court* (1999) 74 Cal.App.4th 393, 397 [87 Cal.Rptr.2d 870]; cf. *In re Paul E.* (1995) 39 Cal.App.4th 996, 1003–1004 [46 Cal.Rptr.2d 289] ["At the outset, we may eliminate the idea that the failure of the parents to comply completely with the service plan *by itself* justified removal"].) Mother substantially, though not strictly, complied with the terms of the reunification plan.

## B. *Substantial Progress Toward Alleviating or Mitigating the Causes Necessitating Placement*

■  We also keep in mind the purpose of the reunification plan is "to overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court, supra,* 45 Cal.App.4th at p. 1748.) The juvenile court found Mother had not made substantial progress toward alleviating or mitigating the causes necessitating placement. Substantial evidence does not support that finding.

The children were removed from Mother's custody because she had left them alone on one occasion because she had to go to work. Mother had

---

[2] Mother also tested positive for marijuana in August 2002, before the allegations of the petition were sustained, and before the juvenile court imposed twice-weekly drug testing.

arranged for Father to take care of the children, but his car broke down, and he failed to arrive before Mother had to leave. Mother was faced with a dilemma: Leave the children home alone, or arrive late or fail to appear for work. Mother used poor judgment in resolving that dilemma. However, no evidence was presented, other than the social worker's rumination, directly linking marijuana or alcohol use with this lapse in judgment.

Most significantly, as of the six-month review in February 2003, Mother's therapist reported Mother was " 'far removed from ever leaving children unattended' " and had learned " 'proper parenting and boundaries of protecting the children.' " Mother had accepted "responsibility for the circumstances that caused the children to be brought into custody." There was never another reported incident of Mother leaving the children unattended. During the trial period of custody, there was no report of Mother leaving the children unattended.

Mother's missed, diluted, and positive drug tests prompted the social worker and the juvenile court to opine that Mother might have an unresolved substance abuse problem that affected her parenting judgment. Mother's missed and positive drug tests—assuming Mother's excuses were not true—do raise concerns. However, the children were not initially detained due to Mother's drug use, and the petition did not raise drug abuse as a ground for removing the children from Mother's custody.

We recognize the decision whether to return a dependent child to parental custody is not necessarily governed solely by whether the parent has corrected the problem that required court intervention. For example, in *In re Joseph B.* (1996) 42 Cal.App.4th 890, 893 [49 Cal.Rptr.2d 900], the minor was detained on the ground the parents had physically abused him. By the time of the 18-month review hearing, the parents had completed the reunification plan and had corrected the problem leading to the detention. (*Id.* at pp. 900–901.) The minor, however, was severely scarred emotionally by the physical abuse and suffered emotional distress at the prospect of being returned to the parents' custody. (*Id.* at pp. 901–902.) Thus, although emotional abuse was not alleged as a ground for detention, the minor's emotional detriment from being returned to the parents' custody was "a manifestation of the original basis for dependency." (*Id.* at p. 903.) In *In re Dustin R., supra,* 54 Cal.App.4th at page 1140, the court stated the holding of *In re Joseph B.* "applies only when the risk of detriment at the 18-month hearing was caused by the parent's actions leading to the out-of-home placement."

Here, Mother has made "substantive progress" in court-ordered treatment programs addressing the problems identified as causing the detention.

Mother's general compliance with the reunification plan and substantive progress are "indic[ia] of progress toward family preservation [citation]." (*In re Dustin R., supra,* 54 Cal.App.4th at p. 1140.) There is no evidence any detriment in returning the children to Mother's custody was caused by Mother's actions leading to the detention. We do not foreclose the possibility a substance abuse problem detected after initial detention might be a reason for denying return of a dependent child to the parents' custody. The question in that situation would be whether reasonable reunification services relating to the substance abuse problem have been offered and whether the substance abuse problem means return of the child would create a substantial risk of detriment to the physical or emotional well-being of the child. As explained below, substantial evidence does not support the juvenile court's finding of substantial risk of detriment here.

### II. Substantial Risk of Detriment to the Physical or Emotional Well-Being of the Children

■ We address the underlying question posed by section 366.22: Whether substantial evidence supports the juvenile court's finding that return of the children to Mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being. "The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a).)

The analysis begins with repeating some basic facts about Mother that place this case in stark contrast to so many other dependency cases that have reached the stage of the permanency hearing. Mother is gainfully employed in a responsible position. She has had the same employer for over two years, since before these proceedings began, and received a promotion in October 2002. No concern has been expressed about Mother's current living conditions. There was no evidence that either Mother or Father ever physically or emotionally abused the children, other than (arguably) the incident leading to their detention. Mother has never been incarcerated. There was no evidence Mother has any mental illness or physical impairment affecting her parenting skills. Mother always acted appropriately with the children during monitored visits. The relationship between Mother and the children is and has always been that of parent and children. Mother was cooperative with the social worker. There was no evidence Mother has used any drugs other than alcohol and marijuana, or that she ever drank alcohol or smoked marijuana around the children.

The social worker, through the status review reports, continually reported Mother's parenting skills were improving. At the 18-month review hearing, the social worker testified Mother had good skills and "pretty much does

those things that we normally associate with good parenting." As explained above, Mother's therapist believed as early as the six-month review Mother was " 'far removed from ever leaving children unattended' " and had learned " 'proper parenting and boundaries of protecting the children.' " During the trial period of custody, there was no report of Mother leaving the children unattended. Although Mother left the children with an unauthorized caretaker, Mother advised the social worker she was doing so temporarily and reported she had contacted a licensed caretaker. As for the "domestic violence" episode, there is no evidence of threats made during the telephone argument between Mother and Father, and a heated argument over the telephone alone is not domestic violence. Mother's behavior in comforting Christian afterwards demonstrates her parenting capabilities.

The basis for the juvenile court's finding of detriment primarily was Mother's missed, diluted, and positive drug tests between the 12-month review report/hearing and the 18-month review report/hearing. Unauthorized possession of marijuana is illegal. (Health & Saf. Code, § 11357.) The record does not support a finding, however, that Mother's marijuana use, as shown by the record, means the children's return to Mother would create a *substantial* risk of detriment to the physical or emotional well-being of the children in light of the factors in this case militating in favor of their return. No evidence was presented to establish Mother displayed clinical substance abuse, that is, "[a] maladaptive pattern of substance use leading to clinically significant impairment or distress . . . occurring within a 12-month period." (Am. Psychiatric Assn., Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2000) p. 199.) No medical professional diagnosed Mother as having a substance abuse problem, no medical professional testified at the 18-month review hearing, and there was no testimony of a clinical evaluation. "We have no clinical evaluation, no testing to indicate [substance abuse], just the opinion of the mother's social worker and a therapist." (*Blanca P. v. Superior Court, supra,* 45 Cal.App.4th at p. 1751.)

Further, no one offered testimony linking Mother's marijuana and alcohol use to her parenting judgment or skills. The social worker did not modify Mother's visitation schedule after the positive test in December 2003 because he "didn't see any danger to the children based upon that one positive test." At the hearing, the social worker claimed that might have been a mistake on his part, but the fact remains his initial reaction was the positive marijuana test did not pose a danger to the children. The social worker testified that in his many contacts with Mother, she never seemed to be under the influence of alcohol or drugs. Most critically, the social worker testified Mother did not have a drug problem that affected her parenting skills. The evidence was insufficient to support a finding Mother could not provide a home "free from the negative effects of substance abuse." (§ 300.2.)

As set forth in the disposition, the juvenile court is directed on remand to hold a new section 366.22 hearing. The purpose of the hearing is solely to consider evidence from after January 12, 2004, the date of the prior hearing. In the absence of new evidence of detriment, the juvenile court is directed to return the children to Mother's physical custody. SSA must prepare a supplemental 18-month status review report. If minors' counsel takes any position other than return of the children to Mother's custody, counsel shall submit a report explaining, under penalty of perjury, the efforts made to ascertain the children's desires and identifying those desires, if known. In all respects, SSA, minors' counsel, and the juvenile court should proceed with due regard to the Legislature's directive that "[t]he focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (§ 300.2.)

### DISPOSITION AND ORDER

Mother's writ petition pursuant to California Rules of Court, rule 39.1B is granted. Let a peremptory writ of mandate issue directing the juvenile court to vacate its January 12, 2004 order terminating reunification services and setting a section 366.26 permanency hearing. The juvenile court is directed to hold a new hearing under section 366.22 no later than 60 days from the date of this opinion for the sole purpose of considering evidence from after January 12, 2004. SSA is directed to prepare a supplemental 18-month status review report. In the absence of new evidence of detriment, the juvenile court is directed to return the children to Mother's physical custody. If minors' counsel takes any position other than supporting return of the children to Mother's custody, minors' counsel must submit a report explaining, under penalty of perjury, the efforts made to ascertain the children's desires and identifying those desires, if known.

This opinion shall be deemed final forthwith. (Cal. Rules of Court, rule 24(b)(3).)

Sills, P. J., and Aronson, J., concurred.