Filed 10/28/21  Marisol A. v. Superior Court CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MARISOL A., <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF SOLANO COUNTY, <br><br> Respondent; <br><br> SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT et al., <br><br> Real Parties in Interest. | A163221 <br><br> (Solano County Super. Ct. No. J44400) |

Petitioner Marisol A. (Mother) initiated this writ proceeding after her reunification services with her now two-year-old daughter Elizabeth C. were terminated, and the matter was set for a hearing under Welfare and Institutions Code section 366.26.[1]  The hearing is set for November 23, 2021. Mother challenges the juvenile court's finding at the 24-month review that return of Elizabeth to her Mother would create a substantial risk of harm. (§ 366.22, subd. (a)(1).)  We agree that the finding is not supported by

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

substantial evidence.  (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341 (*Jennifer A.*) [finding of detriment subject to substantial evidence standard of review].)  We therefore grant the petition and issue the writ.

## I. BACKGROUND

In February 2019, the Solano County Department of Health and Social Services (Department) received a referral for newborn Elizabeth after Mother had tested positive for methamphetamine during her pregnancy.  Mother, however, tested negative at the time of the birth and Elizabeth was "not showing any signs of 'withdrawal.' "  Mother reported that she had used methamphetamine, but not in the last three months of her pregnancy.

The Department filed a petition alleging Elizabeth was within the jurisdiction of the juvenile court under section 300, subdivisions (b)(1) and (j).  As to subdivision (b)(1), the petition alleged that Elizabeth was at substantial risk of harm due to Mother's substance abuse during the pregnancy and inability to demonstrate a safe living situation.  As to subdivision (j), the petition alleged that Elizabeth's older brother, Andrew, was removed by the Department in 2018 due to Mother's substance abuse and homelessness issues, as well as domestic violence involving the children's father, Jose G.P. (Father).  The alleged domestic violence involved a single incident on May 17, 2017, where Mother purportedly threatened Father with a kitchen knife and Father sustained injury to his neck area.  Father stated that this was an " 'incorrectly or rogue' " reported incident.  Parental rights as to Andrew were terminated in 2018 for failure to follow through with services, and Andrew was adopted by his paternal aunt.

At the detention hearing, the court found a prima facie case had been made that Elizabeth came within section 300, there was a substantial danger to Elizabeth's health, and there were no reasonable means to protect her

health absent removal; it ordered Elizabeth detained.  The court ordered supervised visitation, alcohol and drug testing, substance abuse treatment, and parenting education and mental health services for both Mother and Father.

In its jurisdiction/disposition report, the Department recommended continued out-of-home placement for Elizabeth with substitute caregivers, noting the aunt who adopted Andrew was not interested in placement of Elizabeth.  It reported that both Mother and Father had shown up to every scheduled visitation, and had been given contact information to initiate other services.  It also reported that Mother had missed one of her drug tests, but tested negative on her other test.

At the jurisdiction and disposition hearing, the court found Elizabeth's out-of-home placement necessary and declared dependency.  It found true the allegations under section 300, subdivisions (b)(1) and (j).  Reunification services were ordered, and the case plan directed Mother and Father to (1) participate in a parenting education program, (2) maintain stable housing, and (3) remain sober and submit to random drug tests.

In its November 2019 status review report, the Department reported that Mother and Father had completed three of the four parenting classes, and had maintained "stable and suitable" housing for the past six months, renting a room in a private home.  It also reported that Mother had been "cooperative with services" and "demonstrated behavioral change."  Mother was "very attentive" during visitation with Elizabeth and had been "consistent" in drug testing.  Mother missed her first drug test, but then submitted to nine tests:  eight were negative for all substances and one was positive for alcohol.  Father, however, had tested positive for methamphetamine on four of his five tests.

At the six-month status review hearing, the court found that Mother had made "adequate" progress toward alleviating or mitigating the causes necessitating Elizabeth's placement.

In its April 2020 status review report, the Department reported that Mother had "demonstrated positive parenting techniques during her visits on a weekly basis" and completed her parenting classes. She had submitted to 14 drug tests, each of them negative. Mother missed two tests during this period. Father tested positive for methamphetamine on 10 of his 12 tests. The Department requested a psychological evaluation be ordered for Mother and Father, as they had reported people "spying" on them and "cameras" being outside of their residence and in their room. Mother had also reported "hearing voices."

At the 12-month review hearing, the court ordered a psychological evaluation for both parents. The court again found that Mother had made "adequate" progress toward alleviating or mitigating the causes necessitating Elizabeth's placement.

Mother underwent the psychological evaluation in May 2020. The evaluator reported that Mother denied any concerns with alcohol abuse or dependence, but acknowledged she had used methamphetamine for three to four years before stopping 15 months prior. "Concerns of delusions and paranoia were observed," including Mother's belief that her ex-landlord had spied on her. The evaluator concluded that "the results of this psychological assessment suggest [Mother] presents with a Delusional Disorder, Persecutory Type, Continuous." She continued: "However, her delusions do not interfere with her functioning and her behavior is not obviously bizarre or odd." The evaluator noted that Mother "will benefit from continued

4

therapeutic services and a consultation with a psychiatrist." Based on this report, the Department referred Mother for a psychiatric evaluation.

In its August 2020 status review report, the Department reported that Mother was "very attentive" during all available visits with Elizabeth. Mother had submitted to six drug tests: five were negative for all substances and one was positive for alcohol. She missed two tests during this period because she arrived late to probation. Mother was also asked to complete a hair strand test; she agreed and tested negative. The social worker stated she "would like to ensure that [Mother] has not traded one drug for another, and is not attempting use to treat her newly discovered mental health symptoms." Father only submitted to two of his eight drug tests, and tested positive for methamphetamine on both tests. Father reported that he did not want to participate in any services and wanted Elizabeth to reunify with Mother. The Department recommended continued reunification services for Mother, but termination of services for Father.

At the 18-month review hearing, the court terminated reunification services for Father. It again found that Mother had made "adequate" progress toward alleviating or mitigating the causes necessitating Elizabeth's placement.

In its March 2021 status review report, the Department reported that Mother was "always on time and regularly visiting her child." During one visit, Mother "appeared to be examining" Elizabeth's body "for a longer time than a typical diaper change would warrant." The incident had not occurred before and was discussed with Mother, who stated that "she had the right to inspect her daughter." Mother had submitted to 14 drug tests: eight were negative for all substances, five were positive for alcohol, and one was too dilute for testing. She missed one test during this period. The Department

reported that urine tests for alcohol can "reveal very small acute doses, chronic alcohol consumption, and anything in between." The social worker did not refer Mother to a substance abuse treatment program because Mother "continues to deny that she is abusing substances." Mother had maintained housing in a rented room, but Father no longer resided there. Mother had two jobs: cleaning offices and working in the fields. When the social worker went to search for Father at a previous address, the owner reported that Father had been asked to leave in October 2020. The owner reported seeing Father push Mother down the stairs on one occasion, and yell and curse at her on other occasions. Mother stated that she had arguments with Father, but denied he had pushed her down the stairs. Mother reported that she and Father were no longer in a romantic relationship, but she provided Father with transportation to visits with Elizabeth and court hearings. The Department reported that in December 2020, Mother stated she believed that Elizabeth's substitute caregivers were following her in their car. It also reported that Mother was seen for the psychiatric evaluation, but declined medications at that time. The Department recommended that Mother's reunification services be terminated.

At the 24-month review hearing in July 2021, Mother testified that she had been clean from methamphetamine for two years. She explained that she had thought people were spying on her only when she was using methamphetamine. Mother stated her subsequent concerns related to her lack of privacy from renting a room in a home, as others could overhear her conversations. Mother stated that, in December 2020, one of the substitute caregivers had followed her after a visitation; she had taken a picture of his truck. She stated that, in March 2020, she noted a van parked outside her

house that was then parked outside the apartment where she had her visitations. Mother also testified regarding the psychiatric evaluation. She stated that the psychiatrist only asked her whether she needed medication, and she responded that she did not because she was " 'feeling fine.' " Social services supervisor Everett testified that medication had been "discussed" during the evaluation but was declined by Mother. Everett confirmed that no referral for therapeutic or support services had been made. Everett also testified that Mother's inspection of Elizabeth's body during her visitation "appeared" to stem from Mother's "belie[fs] that something was going on in the substitute care provider's home" and thus it would "appear" that Mother's delusional disorder was affecting her care and parenting of Elizabeth. Everett testified that there was no history of Mother removing Elizabeth's clothes solely for the purpose of examining her body, and there were times where it was appropriate for Mother to comment on Elizabeth's body because she had a rash or scratch.

Mother testified that she had not lived with Father for the past nine months. She requested that Father not be permitted to live at the house because she "made the decision to choose [her] daughter." Mother admitted that they had had "arguments as a couple," but again denied that Father ever pushed her down the stairs. Mother had not had a romantic relationship with Father for the past nine months; she drove Father to visits because she did not want Elizabeth "to lose contact," but stopped when advised to do so by social workers after Father's services were terminated. When Mother was asked if Father was an "unsafe parent" for Elizabeth, she responded: "Not exactly, because he likes kids. And I was able to meet one of his daughters, and he was very loving towards his girl. And even my son got to meet his sister." Mother stated that she did not know if Father was

still using drugs because she had not seen him. When asked if she still loved Father, Mother responded: "Perhaps, yes." Mother stated that she would follow any orders regarding Father's access to Elizabeth, but if it was up to her and not precluded by the court or the Department, she would allow Father to visit with Elizabeth.

Mother admitted she had previously consumed alcohol at times, but "[o]nly up to two, three beers" when she did drink. She admitted that she initially denied drinking to her social worker "[b]ecause she was going to judge me in a way that is not necessary." Mother stated she had now stopped drinking because she "knew it was a mistake" and did not want to lose Elizabeth. Everett testified that she did not know whether Mother was ever told she could not have any alcohol. Everett also testified that Mother had continued to participate in drug testing and that for the past five months, Mother had not tested positive for alcohol.

At the end of the hearing, the court acknowledged that "[t]his is a very close case." It continued: "[T]he evidence certainly shows that Mom loves Elizabeth, but the evidence shows me that the mental health issues that are identified in the psychological report in this case and maybe other character-like logical issues that Mom has means that she doesn't recognize dangerous situations that may crop up. She doesn't recognize the dangers that [Father] presents to her. She doesn't view what she sees the same way other people do, and, therefore, has and certainly can in the future misconstrue what is going on so that, while she may think something is dangerous and it's not or something is not danger and it is, the reality would be difficult. And there are times when Mom simply chooses to not tell the truth to authority figures, even when we would also say it is—well, while it's painful, it would be in her best interest to do so." Accordingly, the court

8

found it "improbable that the agency would be able to provide the kind of safety net that is the agency's responsibility and that Elizabeth needs" and thus concluded "there is a substantial risk to Elizabeth were we to return her at this time." The court terminated Mother's reunification services and set a section 366.26 hearing. The court, however, also expanded Mother's visitation to four hours per week (instead of two) and noted its expectation that the schedule would be further expanded "if Mother does as well in visitation as she's done to date" to ensure that Elizabeth had "more enjoyable time" with Mother.

## II. DISCUSSION

Mother challenges the juvenile court's finding from the 24-month review hearing that there was "substantial risk" to Elizabeth if she were returned to Mother's custody. Specifically, Mother contends that the finding was in error because (1) she had completed her case plan and ameliorated all of the conditions that led to Elizabeth's removal, and (2) any subsequent concerns identified after the removal did not support the finding.

"[A]t each review hearing prior to permanency planning, there is a statutory presumption that the child will be returned to parental custody." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 308.) Thus, the juvenile court in this case was required to return Elizabeth to Mother's physical custody unless it found, by a preponderance of the evidence, that doing so would "create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) "That standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member."

9

(*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) "Rather, the risk of detriment must be *substantial,* such that returning a child to parental custody represents some danger to the child's physical or emotional well-being." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400.) The Department bears the burden of establishing such detriment. (§ 366.22, subd. (a)(1).) Whether or not the child is returned to her parent, the juvenile court must specify the factual basis for its decision. (§ 366.22, subd. (a)(2).)

We review the juvenile court's finding of detriment for substantial evidence. (*Jennifer A., supra,* 117 Cal.App.4th at p. 1341.) "In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) " 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Id.* at p. 689.) "Substantial evidence, however, is not synonymous with any evidence." (*In re James R.* (2009) 176 Cal.App.4th 129, 135.) "Although substantial evidence may consist of inferences, those inferences must be products of logic and reason and must be based on the evidence. Inferences that are the result of mere speculation or conjecture cannot support a finding. The ultimate test is whether a reasonable trier of fact would make the challenged ruling considering the whole record." (*Ibid.*)

We begin with Mother's contention that the detriment finding is not supported by substantial evidence because she completed her case plan. "Compliance with the reunification plan, though not determinative, is a pertinent consideration at a section 366.22 hearing." (*Jennifer A., supra,* 117 Cal.App.4th at p. 1341; § 366.22, subd. (a)(1) [requiring juvenile court to

10

consider the efforts or progress made by the parent, and the extent to which the parent participated in reunification services, in evaluating risk of detriment].)  Here, the record shows that Mother complied with her case plan:  she completed her parenting education program, maintained stable housing for over two years, and *never* tested positive for methamphetamine on her drug tests.  Even presuming Mother's few missed and dilute tests would have been positive, her forty negative tests showed substantial compliance with her case plan.  (*Jennifer A.*, at p. 1343 [concluding 15 missed or diluted drug tests out of 95 total tests constituted substantial compliance].)

We turn next to Mother's contention that other concerns, identified after Elizabeth's initial detention, do not support the detriment finding.  "We recognize the decision whether to return a dependent child to parental custody is not necessarily governed solely by whether the parent has corrected the problem that required court intervention."  (*Jennifer A.*, *supra*, 117 Cal.App.4th at p. 1344.)  The question is whether there was substantial evidence that these other concerns created a substantial risk of detriment to Elizabeth.  (*Id.* at p. 1341.)  Here, the court identified two areas of concern to support its finding of substantial risk:  (1) Mother's mental health issues; and (2) Mother's relationship with Father.

As to the mental health issues, we are not convinced there was substantial evidence that Mother's delusional disorder created a substantial risk of detriment to Elizabeth.  As a preliminary matter, the psychological evaluation specified that Mother's delusions "do not interfere with her functioning."  Moreover, no qualified medical health professional evaluated the effect of Mother's diagnosed delusional disorder on her ability to parent.  (Cf. *Constance K. v. Superior Court* (1998) 61 Cal.App.4th 689, 708 [concluding substantial evidence supported detriment finding where two

11

psychologists opined mother would be unable to cope with children's return].) Instead, the social services supervisor testified that it would "appear" Mother's delusional disorder was affecting her parenting because Mother had inspected Elizabeth's body during some of her visitations. Everett also testified, however, that Mother only made such inspections during routine diaper and clothing changes, and there were in fact times where Elizabeth had a skin issue that warranted comment.

Nor are we convinced there was substantial evidence that Mother had replaced her methamphetamine abuse with alcohol abuse, concurrent with her mental health symptoms. No evidence was presented to establish that Mother displayed "clinical" alcohol abuse, "that is, '[a] maladaptive pattern of substance use leading to clinically significant impairment or distress . . . occurring within a 12-month period." (*Jennifer A.*, *supra*, 117 Cal.App.4th at p. 1346, quoting Am. Psychiatric Assn., Diagnostic & Statistical Manual of Mental Disorders (4th ed. 2000) p. 199.) No medical professional diagnosed Mother as having an alcohol abuse problem; there was no clinical evaluation or testing on the issue. (*Jennifer A.*, at p. 1346.) The record shows, to the contrary, that Mother previously drank on occasion and had "up to two, three beers" when she did drink. She tested negative for alcohol on the vast majority of her drug tests. More importantly, after initially denying this drinking, Mother testified that she had stopped altogether well before the 24-month review hearing. Consistent with that testimony, she had tested negative for alcohol on all her drug tests over the preceding five months. On this record, we cannot conclude there was substantial evidence that Mother had an alcohol abuse problem that created a substantial risk of detriment to Elizabeth.

As to Mother's relationship with Father, we are similarly unpersuaded that there was substantial evidence of a relationship sufficient to support the detriment finding. As a preliminary matter, the two specific instances of alleged domestic violence occurred years before the 24-month hearing: one incident occurred in May 2017, two years before Elizabeth was even born and which Father described as an " 'incorrectly or rogue' " reported incident; the other occurred sometime before October 2020, which the parents also denied. Moreover, at the 24-month hearing, Mother testified that her romantic relationship with Father ended nine months prior and she had not lived with him since that time. The Department confirmed that Father was no longer living with Mother and was not welcome at the residence. Mother also testified that she had driven Father to visits but stopped when advised to do so by social workers after his services were terminated. This evidence showed Mother's efforts to discontinue, not maintain, her relationship with Father. (Cf. *Constance K. v. Superior Court*, *supra*, 61 Cal.App.4th at p. 705 [court may consider at section 366.22 hearing whether parent "maintains" relationships with persons whose presence will be detrimental to child].)

In sum, we conclude that the court's finding of "substantial risk" to Elizabeth if she were returned to Mother's custody was not supported by substantial evidence.

As set forth in the disposition, the juvenile court is directed on remand to hold a continued 24-month hearing and to require the Department to prepare a supplemental 24-month status review report. The purpose of the hearing is to consider evidence from after July 30, 2021, the last day of the prior hearing. For example, new evidence regarding Mother's mental health, substance abuse, or relationship issues may support a finding that Elizabeth's return to Mother's physical custody "would create a substantial

13

risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.22, subd. (a)(1).) In the absence of new evidence, however, the juvenile court is directed to return Elizabeth to Mother's physical custody. (*Ibid.*) The juvenile court may retain jurisdiction and place such conditions on the return of Elizabeth to Mother as are within its powers as a dependency court with authority to protect Elizabeth (§§ 366.22, 364), including but not limited to Mother's required cooperation in family maintenance services, periodic drug testing, and provision of safe and stable housing for Elizabeth.

## III. DISPOSITION

The petition is granted. Let an extraordinary writ issue directing the juvenile court to (1) vacate its orders terminating reunification services and setting a hearing under section 366.26; (2) set a continued 24-month hearing at the earliest convenient time, for the purpose of considering evidence from after July 30, 2021; and (3) direct the Department to prepare a supplemental 24-month status review report. In the absence of new evidence of detriment, the juvenile court is directed to return Elizabeth C. to Mother's physical custody. This decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

STREETER, J.

WE CONCUR:

POLLAK, P. J.
ROSS, J.[*]

---

[*] Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.