Filed 8/8/14  L.M. v. Superior Court CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| L.M.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>    Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>    Real Party in Interest. | No. B255708<br><br>(Los Angeles County Super. Ct.<br>  No. CK95727) |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Philip L. Soto, Judge.  Petition denied.

Law Offices of Katherine Anderson, Jennifer Pichotta and Anuradha Khemka for Petitioner.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Denise M. Hippach, Deputy County Counsel, for Real Party in Interest.

_____

L.M., mother of J.M., petitions for extraordinary relief from the dependency court's orders entered following a hearing held pursuant to Welfare and Institutions Code section 366.22, subdivision (a). [1] Mother contends the court erroneously found that returning J.M. to her custody would create a substantial risk of detriment to the physical and emotional well-being of the child. We deny the petition for extraordinary writ.

## STATEMENT OF FACTS AND PROCEDURE

On September 19, 2012, Child Social Worker (CSW) Kristina Martinez responded to a referral alleging that mother, who has a history of drug use, had engaged in violent behavior in the presence of her one-year-old child. She shoved her sister's boyfriend, and removed and threw the family's fire alarm detectors into the street, claiming that people were using them to spy on her. On one occasion, she shoved her mother, hit her father, and threatened to shoot her family. The police were called and she was taken to the hospital, where she was placed on a psychiatric hold.

The CSW interviewed mother in the hospital, where she was diagnosed with depression not otherwise specified (NOS), and tested positive for marijuana and "benzo." Mother said she had a medical marijuana license and smoked marijuana three times a day. She admitted that she was sometimes under the influence when caring for J.M. She stated that she last used ecstasy a few months ago and that she had used methamphetamine years ago. Mother signed a safety plan, by which she agreed that she would stay at maternal grandmother's home upon release from the hospital, and that her interactions with J.M. would be monitored by family members.

Following her release from the hospital, mother began living with J.M. in maternal grandmother's home. Upon discharge, she was prescribed medication but she never filled the prescription because "[she] didn't feel like [she] need[ed] to take it." Mother

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

was left alone with J.M. on one occasion when she refused to follow the safety plan, but maternal grandmother needed to leave. When maternal grandfather went to check on her later in the day, he found J.M. alone. Mother did not return home that night, so maternal grandmother filed a missing person's report with the police.

At that point, the Department of Children and Family Services (Department) detained J.M. and placed him with maternal grandmother. Shortly thereafter, on September 28, 2012, the Department filed a section 300 petition and a detention hearing was held on the same day. Mother failed to appear. Father has never met J.M., and his whereabouts are unknown.

In a subsequent interview, mother admitted that she had left J.M. at home alone because she "just wanted to get out of the house." She told the CSW that she was not in a position to take care of J.M.

On October 22, 2012, the court held a jurisdiction hearing. Once again, mother failed to appear. The court sustained the section 300 petition, which alleged that mother had engaged in violent behavior in the child's presence, had a history of drug use, suffered from mental and emotional problems, and had left J.M. at home alone without adult supervision. The court removed J.M. from mother's custody and ordered visitation and reunification services for mother.

In November 2012, during a monitored visit, mother pushed maternal grandmother, attempted to hit her, and accused her of trying to steal J.M. She was under the influence of marijuana at the time. The police were called and mother was placed on a two-week psychiatric hold. She was released with medication, but there is no evidence that she took the medication.

On February 5, 2013, mother enrolled in an outpatient drug treatment program at the National Council on Alcoholism and Drug Dependence (NCADD). She made her first court appearance at an April 22, 2013 review hearing held pursuant to section 366.21, subdivision (e).

In June 2013, mother was hospitalized for a suicide attempt. She had become paranoid and started hearing voices. She also admitted that, prior to the suicide attempt,

3

she had used ecstasy and taken some expired medication stolen from her mother. She remained enrolled at NCADD, but had tested positive for drugs on three occasions, once in February, once in March, and again in June. She also refused testing on another occasion in June when she was slurring her speech and reportedly hearing voices.

In August 2013, mother showed up at maternal grandmother's home and started banging on the door. When maternal grandmother refused to allow her inside, mother stood in the street and exposed herself. The police were called, and mother was placed on a psychiatric hold and taken to a medical facility where she was diagnosed with psychosis NOS. She was discharged with medication, which she took for a while but then voices told her to stop taking it. About six weeks after her discharge, on September 27, 2013, mother was admitted to a one-year inpatient substance abuse treatment program at Via Avanta.

The juvenile court held a contested hearing pursuant to section 366.21, subdivision (f) on November 5, 2013. Via Avanta reported that mother was "progressing very well" and exhibiting "a genuine desire to stay clean and become a good parent." She was participating and had tested negatively for all drugs. Although the Department recommended termination of reunification services, the court continued services, finding a "substantial probability" that J.M. would be returned to mother's custody pursuant to section 366.21, subdivision (g).

While at Via Avanta, mother received visits with J.M. monitored by maternal grandmother, which went well. In early February 2014, mother began receiving unmonitored visits. The first two unmonitored visits were stressful for J.M., who had a difficult time leaving maternal grandmother. Although he reportedly stopped crying after maternal grandmother left and completed the remainder of the first visit without incident, maternal grandmother reported that he displayed anxious behavior after the visit. While getting ready for the second unmonitored visit, J.M. started to cry and told maternal grandmother that he did not want to go, saying, "no mommy, no mommy, me stay poppa."

4

On March 11, 2104, the court held a section 366.22 hearing. In a letter to CSW Estelle Berry dated January 23, 2014, Via Avanta reported that mother had "exhibited a profound change since her enrollment," having "learned how to be assertive and hold herself and others accountable for their actions." Via Avanta also reported that mother had "shown positive interaction with other children," was "doing an outstanding job in her interaction with her own son," and had "exhibited a genuine desire to stay clean and become a good parent."

By letter dated March 10, 2014, Via Avanta again reported that mother was "progressing very well." The letter continued: "The program coordinator is aware of the process you have in place for her liberalization of visits. We agree that it should be done in moderation, but would like to express our agreement with this arrangement. In our interactions with the Department of Children and Family Services agencies, we have been accustomed to advancing to that stage through a series of visits such as: monitored, unmonitored, extended-day visits, overnights, and finally residing here with client."

In her own report to the court, the CSW recognized that mother was doing well at Via Avanta, but continued to express concerns about mother's mental health, noting that she had been hospitalized and diagnosed with psychosis NOS just six months earlier. The CSW asked the court to order an evaluation under Evidence Code section 730 to assess mother for mental health issues.

The CSW expressed other concerns about mother's readiness for full-time care of J.M. She had been in recovery for only a short time and had never had sole care of J.M. After J.M. was born, she went home to her mother's, and while she cared for J.M. when she could, she came and went from the house pretty much at will, knowing that someone in the home would care for him. The CSW believed that mother needed to spend time learning to care for J.M., and that going from unmonitored visits to full custody would present child safety concerns. Moreover, the unmonitored visits were still causing anxiety for J.M., who needed more time to become comfortable with mother.

A contested section 366.22 hearing was held on April 11, 2014. The Department continued to recommend that reunification services be terminated. It reported that

5

mother's unmonitored visits had been increased from four hours to seven hours as of April 6, 2014, and that J.M. appeared to be "having a good time" during his visits with mother. Nonetheless, the CSW expressed concerns that mother had never been stable enough to provide consistent care for her son, and that going from seven-hour visits to full-time care would be too big a change for J.M., who had grown to rely upon and trust his grandmother. She also expressed concerns about mother's mental health condition.

Following argument, the court terminated mother's reunification services and set an August 8, 2014 hearing under section 366.26, to determine a permanent placement plan for J.M. In reaching its decision, the court agreed with the CSW that it did not have anything before it indicating that mother was ready for full-time care of J.M. Although mother argued that Via Avanta supported J.M.'s immediate return to mother, the court noted that Via Avanta's most recent letter, dated March 10, 2014, agreed with the CSW that liberalization of visits should take a graduated approach, eventually leading to J.M. residing at Via Avanta with mother. The court also noted that mother had not yet completed her one-year inpatient program at Via Avanta. She had started the program late, despite the court's admonishments that she get herself admitted to a live-in program early in the reunification process. At the time of the 366.22 hearing, mother had already received more than 18 months of reunification services. The court found, by a preponderance of the evidence, that returning J.M. to mother would create a substantial risk of detriment to the physical and emotional well-being of the child.

Mother timely filed a notice of intent to file a writ petition.

## STANDARD OF REVIEW

Section 366.22 subdivision (a) states in pertinent part: "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical

6

or emotional well-being of the child. [¶] If the child is not returned to a parent [¶] at the permanency review hearing, the court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, guardianship, or long-term foster care is the most appropriate plan for the child . . . . The court shall also order termination of reunification services to the parent . . . . The court shall determine whether reasonable services have been offered or provided to the parent[.]"

This court reviews the dependency court's findings for substantial evidence. (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1400-1402; *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1341; *In re John V.* (1992) 5 Cal.App.4th 1201, 1212.) We resolve all conflicts in support of the determination, examine the record in a light most favorable to the dependency court's findings and conclusions, and indulge all legitimate inferences to uphold the court's order. (*In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379; *In re Tania S.* (1992) 5 Cal.App.4th 728, 733).

We cannot reweigh the evidence and invoke our judgment over that of the court. "It is the trial court's role to assess the credibility of the various witnesses, to weigh the evidence to resolve the conflicts in the evidence. We have no power to judge the effect or value of the evidence, to weigh the evidence, to consider the credibility of witnesses or to resolve conflicts in the evidence or the reasonable inferences which may be drawn from that evidence. [Citation.] Under the substantial evidence rule, we must accept the evidence most favorable to the order as true and discard the unfavorable evidence as not having sufficient verity to be accepted by the trier of fact. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)

## DISCUSSION

Substantial evidence supports the dependency court's decision. Although mother has made progress since her enrollment in an inpatient substance abuse program at Via Avanta in September 2013, she was still several months away from completing the one-year program at the time of the section 366.22 hearing, which was held 18 months after

7

reunification services began. "[F]ailure to complete the court ordered service plan within 18 months create[s] a presumption of detriment to the children. (Welf. & Inst. Code., § 366.22, subd. (a).)" (*In re Riva M.* (1991) 235 Cal.App.3d 403, 415.) Mother failed to adequately rebut that presumption.

Although mother claims that Via Avanta had informed her that she was ready to have J.M. live with her at the inpatient facility, Via Avanta's most recent letter, dated March 10, 2014, states differently. In it, Via Avanta recognized that liberalization of visits "should be done in moderation," progressing from monitored to unmonitored to extended day visits, then overnights, and eventually, to residing with mother at the facility. Likewise, CSW Berry opined that mother was not ready for full custody of J.M. at the time of the section 366.22 hearing. Mother has never had full-time care of the child, and it would be a "huge jump" to go from seven-hour unmonitored visits to permanent, full-time care.

Also before the court was evidence that mother's most recent hospitalization for mental health problems happened in August 2013, less than eight months before the section 366.22 hearing. She was detained by police, placed on a two-week psychiatric hold, hospitalized, and diagnosed with psychosis NOS after she exposed herself in front of her mother's home. After her discharge, she took the prescribed medication until voices told her to stop.

While enrolled in a drug rehabilitation program at NCADD, she tested positive for drugs on three occasions, and refused a fourth drug test on another occasion when she was slurring her speech and claimed to be hearing voices. At about that time, she was hospitalized for a suicide attempt when she started hearing voices and became paranoid. She later admitted that she had been taking some expired medication that she had stolen from her mother and that she had used ecstasy just before the suicide attempt. She left NCADD without successfully completing the program.

Mother's failure to complete the court-ordered service plan within the 18-month reunification period, her three positive drug tests, her refusal to take a fourth drug test, her inability to successfully complete the NCADD drug rehabilitation program, her

8

repeated hospitalizations for mental health problems, evidence that she did not take medication prescribed for her mental health conditions, her admission that she had stolen drugs from her mother and used ecstasy just prior to her suicide attempt, and her reports that she had been hearing voices — all during the reunification period — constitute substantial evidence supporting the juvenile court's finding that mother was not ready for full custody of J.M., such that returning J.M. to her care would cause substantial risk of detriment to J.M.'s physical and emotional well-being. (See *In re Joseph B.* (1996) 42 Cal.App.4th 890, 899 [whether to return the child to parental custody ultimately depends on the effect it would have on the physical or emotional well-being of the child].)

Mother takes issue with the court's focus on her failure to complete the one-year program at Via Avanta because she started the program late in the reunification period. Mother argues the court was not looking at the circumstances before it at the time of the section 366.26 hearing, but instead punishing mother for her previous transgressions. To the contrary, the court acted well within the statutory scheme's strictures in considering mother's failure to complete the program within the 18-month reunification period. (See *In re Riva M.*, *supra*, 235 Cal.App.3d at p. 415 ["[F]ailure to complete the court ordered service plan within 18 months create[s] a presumption of detriment to the children"].)

"[T]he Legislature has determined a child's need for stability and security within a definitive time frame becomes paramount. The cutoff date for fostering family reunification is the 18-month status review. At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children. (Welf. & Inst. Code, § 366.22.)" (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1788.) "The Legislature has determined that the juvenile court must embrace or forsake family preservation at this point by circumscribing the court's options." (*Ibid.*)

Mother received a full 18 months of reunification services, and failed to complete the court-ordered plan because of her own delays, not because the Department failed to provided reasonable reunification services. She did not make her first court appearance until April 2013, some six months after the court ordered reunification services. She

9

enrolled in a drug rehabilitation program at NCADD in February 2013, but failed to complete the program. Not until September 2013 did she enroll in an inpatient program at Via Avanta. She was provided visitation, but had not progressed beyond seven-hour unmonitored visits at the time of the section 366.22 hearing. CSW Berry testified that the visits were not liberalized sooner because mother did not enroll in Via Avanta until September 2013 and because J.M. had a difficult time with the visits, becoming upset and stressed because of them.

At the 18-month mark, the juvenile court was presented with the choice between returning J.M. to mother's care on a permanent, full-time basis, or terminating reunification services and setting the matter for a permanency hearing pursuant to section 366.26. Based on the record, we find that substantial evidence supports the juvenile court's decision to terminate services and set a section 366.26 hearing.

**DISPOSITION**

The petition is denied.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KRIEGLER, J.

We concur:

TURNER, P. J.                              MINK, J.[*]

---

[*]     Retired judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.