Filed 12/12/23  T.R. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| T.R.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SOLANO COUNTY,<br><br>    Respondent;<br><br>SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT,<br><br>    Real Party in Interest. | A168809<br><br>(Solano County Super. Ct. No. J45386) |

T.R. (Father) petitions this court for extraordinary relief after the juvenile court terminated reunification services with his son, Alexander R., and set a hearing pursuant to Welfare and Institutions Code section 366.26 (all statutory references are to this code).  He contends that the evidence does not support the juvenile court's findings and that the court abused its discretion in reducing his visitation with Alexander.  We deny the petition on the merits.

**FACTUAL AND PROCEDURAL BACKGROUND**

***Jurisdiction and Disposition***

Alexander tested positive for methamphetamine after he was born in November 2021.  His mother (Mother) had not received prenatal care, and

1

she had no provisions for Alexander. She denied ever using drugs, and suggested the positive methamphetamine test might have been the result of drinking an herbal tea given her by a neighbor. She claimed not to have known she was pregnant; however, she later made the contradictory statement that in August, she was told she was 22 weeks pregnant, a statement consistent with her medical records.

Mother initially denied having other children, but when questioned acknowledged she had two older children, neither of them in her custody. One lived with his father and Mother had not seen him for about two years. Another had been the subject of an earlier dependency proceeding, during which Mother failed to reunify and her parental rights were terminated.

Father had a 12-year-old son (Brother), who lived with Father and Mother. Father said he used no substances and he was unaware of Mother's drug use. He did not know Mother was pregnant before he took her to the emergency room.

A home visit raised no safety concerns, and Brother appeared happy and healthy.

Mother and Father were told they were scheduled for drug testing, but they did not appear for the scheduled tests. Minor was detained and placed in a foster home.

The Solano County Health and Welfare Services Department (the department) filed a dependency petition under section 300 on November 12, 2021. At the March 30, 2022 jurisdictional and dispositional hearing, the juvenile court found true allegations as to Mother that she and Alexander tested positive for methamphetamines at the time of his birth, she had untreated mental health and substance abuse disorders, she had not received prenatal care, she had no provisions to care for Alexander, and she had failed

to reunify with an older child and her parental rights were terminated. As to Father, the juvenile court found true that Alexander was at substantial risk of physical harm and/or neglect because Father was unaware that Mother was using drugs despite living in the same house, that Father continued to live with Mother, and that he worked full-time outside the home, preventing him from protecting Alexander from Mother's drug use.

***Six- and 12-Month Review***

The juvenile court retained Alexander in foster care and ordered reunification services for Mother and Father, including supervised visitation twice a week, a psychiatric evaluation for Mother, and drug and alcohol testing for Mother and Father. Mother's case plan required her to participate in counseling, a parenting education program, and substance abuse services. Father's case plan included participating in a parenting education program. The parents' case plans also required them to provide a stable and safe home environment, free of substance abuse, for Alexander.

Before the scheduled September 2022 six-month status review, the department reported that Mother had completed a psychiatric/psychological evaluation, but she had not yet begun mental health services. She had completed a parenting education program. She had begun but failed to complete an outpatient substance abuse program, she had missed 11 of 20 scheduled drug tests (three of the missed tests due to testing positive for COVID-19), and she had tested positive for alcohol once. Father had completed a parenting education program. He was scheduled to drug test 21 times; he missed six tests (two forgiven because of a COVID-19 diagnosis) and tested positive for marijuana 11 times. He said he used marijuana after work to relax and to relieve back pain. Mother and Father regularly visited

Alexander together, and the visits went well.  The visits had recently been changed from supervised to monitored.

The six-month review hearing was continued multiple times, and it ultimately became the 12-month review hearing.

According to a February 2023 status review report, Mother's "mood and affect [had] become erratic" and she provided a letter that she claimed, falsely, was from her therapist attesting to her participation in therapy.  She reported, also falsely, that she had completed a virtual outpatient treatment program and that she had recently become a registered nurse.  She had missed all but two of her random drug tests between August 2022 and February 2023, some of which were excused because she was out of the county.  Of the two samples she provided, one, in January, was positive for methamphetamine and the other, in February, was diluted and could not be properly tested.  Mother said she was not aware of using methamphetamine, and claimed she was exposed while smoking marijuana with Father.

Father continued to use marijuana, but he had agreed not to do so while inside or while in the presence of his children.  Father had been asked to submit to drug testing, and until he did so and produced a negative result, the department was requiring visits to be supervised.

The parents had been generally consistent in visiting Alexander once or twice a week, with a few interruptions due to illness, a trip out of state to visit Father's relatives, and a sudden change of residence due to unpaid rent.  The social worker had suggested increasing visits to one visit with both parents and two individual visits per week, but Mother and Father did not agree to this plan.  Father would not increase the visits unless Mother was also present, and he did not think there was a need for a parenting coach or social worker to be present.  During visits, Father played with Alexander, but

4

did not take initiative with such tasks as feeding him, soothing him, and changing his diaper. When the social worker pointed this out, Father "explained he wanted to allow the mother to bond and 'not do everything' himself." Mother was "observed during visits to have minimal engagement, often instead watching [Father] playing with Alexander."

On January 29, 2023, the social worker received a message from someone posing as a child welfare representative cancelling a scheduled visit.

The parents had not prepared their home or set up the provisions they would need to care for a young child; they said they would get the house ready when Alexander came home. Father acknowledged that Mother's behavior caused concern, but he was not willing to ask her to leave the home so Alexander could live with him.

At the February 27, 2023 review hearing, the juvenile court continued reunification services and set the matter for an 18-month review hearing on July 13.

**18-Month Review**

After additional continuances, a contested 18-month review hearing took place on September 27, 2023. The department recommended that the juvenile court terminate reunification services and set a selection and implementation hearing pursuant to section 366.26.

The department reported that Mother had been diagnosed with a personality disorder with turbulent and histrionic features, and with trauma and stressor-related disorder. She had attended therapy sessions only sporadically, and there was no confirmation that she had done so since April. She had been inconsistent in attending monthly visits with the social worker to discuss her case plan objectives.

Mother had missed most of the random drug tests scheduled during the reporting period without a valid reason. She delayed for several weeks completing a hair strand test, stating she needed time for "preparation"; when the hair strand test was taken in September 2023, it was positive for methamphetamine. Yet, Mother declined a referral to drug dependency court and had not attended an outpatient substance abuse service program, although she said she was open to doing so. She underwent a substance abuse assessment in May 2023, but because she acknowledged using substances only twice, in November 2021 and January 2023, the counselor who conducted the assessment could refer her only to a behavioral health program rather than substance abuse treatment. Mother reported, apparently falsely, that she had contacted a substance abuse treatment center and was waiting to hear about whether a space was available. Also apparently falsely, she said in April that she made arrangements to meet with a substance abuse counselor, but that he failed to show up for the meeting and later told her he had cancelled it.

Father had not provided any drug tests since February or March of 2023, when a test came back positive only for marijuana. He kept his marijuana in a location that could be accessible to a small child. Although he said he would lock it into a higher place, he had not allowed the social worker into the home to find out where the marijuana was now stored. Despite Father's earlier agreement not to use marijuana inside the home or in his children's presence, the department had been told that Alexander smelled of marijuana after visits with Father and that the smell of marijuana came from the home when Alexander was picked up after a visit.

Mother's visits with Alexander were supervised. Father was allowed unsupervised visits in the family's home, but he was not authorized to

supervise Mother's visits. Mother was expected to submit her work schedule to verify that she would not be present in the home when Alexander visited with Father. On one occasion, the social worker learned that Mother was not at work when she said she was scheduled to work. On that day, the couple's car was parked along the building's back wall rather than its assigned parking space, giving the false impression that Mother was out and about with the car. As a result, Father's visits reverted to being supervised. Alexander continued to enjoy his visits with Father. By the time of the review hearing, Father was receiving monitored visits.

Although Father had complied with his case plan, the department did not support returning Alexander to him because the social worker believed he had not shown he could be a primary parent to Alexander, and he was unwilling to separate from Mother.

Father testified that he believed Alexander would be safe in his care. He said he would "never leave [Alexander's] side or leave him alone with my wife." He also expressed willingness to have Mother leave the home and go into an inpatient treatment program, as long as he could be assured that the bills would be paid. Father testified that both he and Mother were currently receiving unemployment benefits, that they would not be able to support two households, and that Mother would be homeless if she had to leave the family home.

Father said that he had no trouble meeting Alexander's needs during unsupervised visits: he fed him, changed his diaper, and played with him, and Alexander was never hurt while under his care. He had successfully cared for Brother as a single parent after the death of his first wife when Brother was eight. He said that he and Mother were a team and she had helped him to raise Brother.

Father testified that he had not known Mother was pregnant, and he was surprised Alexander tested positive for methamphetamines at birth because Mother never used drugs in front of him or showed any signs of being on drugs.

The juvenile court concluded that reasonable services had been offered and that there was no substantial probability Alexander could be returned to his parents by the time of a 24-month review hearing. It relied for this conclusion on the facts that Mother had not tested for drugs as required; that she had been using drugs recently; that she was not participating in substance abuse counseling or treatment or in mental health therapy; that Father did not know that Mother was using drugs or when she used them; and that Father would not be able to ensure he was never away from Alexander in the home. Those factors, the court concluded, posed a substantial risk to Alexander. The court therefore terminated reunification services and set the matter for a hearing under sections 366.26 and 366.3.

The juvenile court also explained that if the parents wished to be successful in a petition to change the court's order under section 388, Mother would need to leave the home, at least temporarily, and that a residential treatment program would be helpful. Father asked to have his visitation remain at the current level of once a week for three hours, but the court reduced visits to one-hour visits twice a month, with the department to have discretion to increase the visits.

## DISCUSSION

### I. Substantial Evidence of Detriment

Father contends that substantial evidence does not support the trial court's finding that Alexander may not safely be returned to his care.

8

At the 18-month hearing, the juvenile court must order a child returned to the parent or legal guardian's custody unless it finds by a preponderance of the evidence that return would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.22, subd. (a)(1).) The court may order an additional six months of reunification services if it finds by clear and convincing evidence that the parent is making significant and consistent progress in establishing a safe home for the child, and if it finds that there is a substantial probability the child will be returned in that extended time or that reasonable services have not been provided. (§ 366.22, subd. (b).) Otherwise, the juvenile court must set a hearing pursuant to section 366.26 to establish a permanent plan for the child. (§ 366.22 subd. (a)(3).)

We review an order terminating reunification services and setting a section 366.26 hearing for substantial evidence, reviewing the record in the light most favorable to the juvenile court's conclusion, and drawing all reasonable inferences from the evidence to support its findings. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) We do not reweigh the evidence or exercise our independent judgment, but rather determine whether the record contains facts sufficient to support the juvenile court's findings. (*Id.* at p. 689.)

Father contends the evidence before the juvenile court is insufficient to support a finding that Alexander would be at substantial risk of detriment if returned to his custody. He points to the evidence that he cared for Brother with no ill effects; that he completed a parenting education class; that he visited regularly with Alexander and that the visits went well; that he did not test positive for any substances other than marijuana; that he drove Mother to her drug testing when he had a car and was unemployed; that he

9

encouraged Mother to participate in mental health services; and that he expressed his intention never to leave Alexander alone with Mother. These factors, he argues, establish that Alexander could safely be returned to his care. And, he urges, Mother's methamphetamine use is not detrimental to Alexander because she has never used the drug in Alexander's presence, and Father has never been aware of her using it.

On this record, the juvenile court could reasonably conclude Alexander could not yet be returned to Father's care safely. Mother was living in the family home, and not only had she missed most of her drug tests, but a recent test had been positive for methamphetamine, suggesting her use of the drug was ongoing. She had not participated in substance abuse treatment, and in fact had denied she used drugs except on two occasions when a test had been positive. Despite her erratic behavior, she participated in therapy only inconsistently and there is reason to think she falsified a letter regarding her participation in counseling.

Father professed willingness to ensure Mother was never left alone with Alexander, but the juvenile court could reasonably doubt the practicality of this suggestion. (See *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2006) 145 Cal.App.4th 692, 694, 699 [explaining, in context of sexual abuse by one parent, "the very concept of monitored visitation is fundamentally incompatible with around-the-clock in-home contact that necessarily includes periods when the designated monitor will be unable to perform his or her protective function"].) The evidence that Father used marijuana inside the home or while Alexander was present despite agreeing not to do so, and that Mother took steps to give the impression she was out with the family's car while a visit was taking place in the home, could also reasonably give rise to concern that Father would not abide by his

10

agreement to ensure Mother was never alone with Alexander. His ability to protect Alexander from Mother is also called into question by his apparent ignorance of her methamphetamine use despite their sharing a residence. The evidence is sufficient to support the juvenile court's findings.

Father contends that *Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, and *In re L.C.* (2019) 38 Cal.App.5th 646, lead to a different result, but neither case assists him. The children in *Jennifer A.* were placed in protective custody after their mother left them alone while she went to work, apparently expecting their father to arrive soon to care for them. Over the ensuing year and a half, she substantially complied with her reunification plan, completed parenting classes and counseling, completed drug treatment, and knew proper parenting behavior. (*Jennifer A.*, at p. 1326.) However, she tested positive for alcohol on one occasion, tested positive for marijuana on at least one other, and missed or was unable to produce a satisfactory specimen on a number of other occasions. (*Id.* at pp. 1342–1343.) The appellate court concluded the mother had substantially complied with the terms of her reunification plan. (*Id.* at p. 1343) The positive and missed tests encompassed only about 11 out of 95 testing obligations. (*Ibid.*) And, the court explained, the finding that she had not made substantial progress toward alleviating the causes necessitating placement was not supported by substantial evidence: there was no indication of a direct link between alcohol or marijuana use and the mother's lapse in judgment in leaving the children alone, she had accepted responsibility for leaving them, drug use was not a ground for the children's removal, and she had made substantial progress in court-ordered treatment programs addressing the problems that caused the detention. (*Id.* at pp. 1344–1345.) There was no evidence she had used any drugs other than

11

alcohol and marijuana or that she used them in the children's presence. (*Id.* at p. 1345.) And she had been steadily employed in a responsible position and there were no concerns about her current living conditions. (*Id.* at pp. 1326, 1345.) The record thus did not support a finding that return to the mother would create a substantial risk of detriment to the children's well-being. (*Id.* at p. 1346.)

Here, in contrast, Mother's use of methamphetamine while pregnant was the cause of Alexander's removal, and she had not adequately addressed that issue: she missed most of her drug tests, she did not participate in drug treatment, she did not comply with the mental health component of her case plan, and she continued to use methamphetamine. *Jennifer A.* does not establish that Alexander was not at substantial risk of detriment in Father's care while Mother lived in the home.

Nor does *In re L.C.* lead to a different result. The appellate court there reversed a jurisdictional order based on a legal guardian's occasional methamphetamine use outside the home, while the child was in the care of another adult, explaining that drug use, without more, is an insufficient ground for dependency jurisdiction. (*In re L.C.*, *supra*, 38 Cal.App.5th at pp. 650, 653–654.) Even before the jurisdictional hearing, the guardian enrolled in a drug treatment class and tested on his own for controlled substances, and he expressed his willingness to continue to test twice a week for controlled substances. (*Id.* at pp. 650–651, 653.) Here, of course, there *was* more than mere drug use; Mother used methamphetamine while pregnant, resulting in Alexander being born exposed to the drug. Father does not contend that was not an adequate basis for removing Alexander from the home, and Mother's continued presence in the home and the practical difficulty of ensuring she is never alone with Alexander, coupled

12

with her ongoing unaddressed drug use, her lack of honesty with the department, and the evidence that she may have been in the home during an unsupervised visit between Alexander and Father, adequately support the juvenile court's findings. (See *In re K.B.* (2021) 59 Cal.App.5th 593, 603–604 [distinguishing *In re L.C.* on ground guardian there ensured child was properly cared for and supervised by another adult and came clean and reformed when he realized he could lose custody].)

As explained in another case distinguishing *In re L.C.*, "The obvious and significant difference between *L.C.* and this case is that mother had the poor judgment to use while she was pregnant and then failed to take the proactive monitoring and treatment steps that L.C.'s guardian took." (*In re E.E.* (2020) 49 Cal.App.5th 195, 214.) Similarly here, the juvenile court "could reasonably infer that [F]ather lived in an environment unsuitable for children" and that he would not be able to protect Alexander from Mother's drug use. (*Id.* at p. 216.)

In reaching this conclusion, we do not suggest the evidence that Alexander would be at substantial risk of detriment in Father's care is overwhelming or that reasonable minds could not differ on this point. The record suggests Father is a capable parent to Brother, and there were no sustained allegations that any positive conduct on Father's part caused a risk of harm to Alexander. We are also troubled by the department's apparent criticism of Father for the loyalty preventing him from separating from his wife, and its lack of expressed concern for the financial difficulty of supporting two households or for where Mother would live if she left the family's home. Nonetheless, in light of the substantial evidence supporting the juvenile court's ruling, we will not disturb it.

## II. Reduction in Visitation

Father also contends the juvenile court abused its discretion in reducing his visitation with Alexander to one-hour visits twice a month (from the previous weekly three-hour visits), while giving the department discretion to increase the visits. He argues that his visits with Alexander went well and that continued weekly visits would allow him to maintain his bond with Alexander, which would assist him if he brought a petition under section 388 seeking additional reunification services or Alexander's return.

Once a juvenile court has terminated reunification services, "the parents' interest in the care, custody, and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317; accord, *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) However, even when reunification services are terminated and a hearing pursuant to section 366.26 is set, the court must continue to allow visitation unless it finds visitation would be detrimental to the child. (§ 366.22, subd. (a)(3); see *In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1504.) "Meaningful visitation is pivotal to the parent-child relationship, even after reunification services are terminated." (*Hunter S.*, at p. 1504.) If a parent is to have any hope of avoiding termination of parental rights by showing he has maintained regular visitation and the child would benefit from continuing the relationship (see § 366.26, subd. (c)(1)(B)(i)), that parent must be able to maintain regular contact with the child. (*Hunter S.*, at pp. 1504–1505.) We review the juvenile court's order on visitation for abuse of discretion (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465), disturbing the exercise of discretion only if the court exceeded the bounds of reason (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557–1558).

At the 18-month hearing, Father asked to have visits maintained at the current level. Counsel for the department objected, explaining that it was department policy to reduce visits, that the matter would be transferred to the adoptions unit, and that the department had "limited capacity to increase those visits at this time." The juvenile court ruled, "I would like to see some progress from mom and dad in terms of father working on some of the issues that remain outstanding. The court is going to reduce the visits to twice a month; one hour per visit, with the department having discretion to increase." The court went on to explain to the parents that the case was "now in your hands. . . . It now becomes really your time to work. . . . [A]nd do the work to either increase the visits, based on what you're able to show, and maybe get additional services, if you're able to be successful in a JV-180 [Request to Change Order]. But now it's your work."

Thus, although the juvenile court reduced the frequency of visits, it did not eliminate them or limit them to a mere token number, instead allowing visits twice a month. And it encouraged Mother and Father to be honest about her drug use, urged Mother to enter a residential program, and gave the department discretion to increase visits if the couple made progress in addressing the issues underlying the dependency. On this record, we see no abuse of the trial court's discretion.

## DISPOSITION

We deny on the merits Father's petition for extraordinary relief. (§ 366.26, subd. (*l*)(1)(C); Cal. Rules of Court, rule 8.452(h).) This decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).) The request for a stay of the January 16, 2024 hearing is denied.

15

TUCHER, P.J.

WE CONCUR:

FUJISAKI, J.
RODRÍGUEZ, J.

*T.R. v. Superior Court* (A168809)

16