Filed 5/19/26  D.E.-S. v. Superior Court CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| D.E.-S.,<br><br> Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO,<br><br> Respondent;<br><br>SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br> Real Party in Interest. | A175680<br><br>(San Francisco City & County Super. Ct. No. JD24-3200) |

D.E.-S. (mother) petitions for extraordinary relief from a juvenile court order at the 12-month review hearing terminating reunification services and setting a permanency plan hearing (Welf. & Inst. Code,[1] § 366.26) for J.E-S. (minor), her now-20-month-old son.  She challenges the sufficiency of the evidence supporting the court's finding that minor could not be returned to her custody by the 18-month date.  We deny mother's petition.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

# I. BACKGROUND

## A. Detention, Jurisdiction, and Disposition

Mother had psychotic episodes when she was pregnant with minor, and it was reported that she used methamphetamine at the beginning of her pregnancy. During minor's delivery in August 2024, mother got on psychotropic medication as prescribed by Dr. Jennifer Annunziata (Dr. Jen), her psychiatrist at Team Lily. Mother moved with minor into Jelani House, where she stabilized for a period. But she stopped taking her medication in October 2024 and became increasingly paranoid, especially after minor fell off the bed. Mother took minor to the hospital twice, ultrasounds were performed, and the doctors informed mother that minor was fine. During one of these visits, mother told the doctor someone had " 'zapped' " minor in retaliation against her. After this, mother started experiencing spiraling delusions and remained fixated on minor's wellbeing.

On November 7, 2024, when minor was two months old, he was detained by the San Francisco Human Services Agency (Agency) based on a referral of general neglect by mother.[2] Despite having been prescribed a new medication, mother had said minor was " 'brain dead' " and was " 'going to die,' " and it was reported she had been subtly shaking him and yelling his name to get him to respond, despite him appearing fine. He was taken into protective custody and placed in foster care. Mother was placed on a grave disability hold but released after a few hours.

The Agency filed a petition pursuant to section 300, subdivision (b)(1), on behalf of minor. The petition alleged mother had mental health and

---

[2] This was the second referral. On September 26, 2024, the Agency received the first referral alleging general neglect by mother. A safety plan was put in place and, at some point, mother entered Jelani House.

substance abuse issues requiring further assessment and treatment.[3]  At the detention hearing, the juvenile court detained minor, approved his foster care placement, and set a jurisdiction and disposition hearing for January 2025.

Following the detention hearing, mother continued to be treated by Dr. Jen, who had not yet reached a diagnosis.  She stated mother's symptoms aligned with a thought disorder, explaining mother focused on "ideas or thoughts that are not 'reality based.' "  It was challenging for her to prioritize new information about minor's safety and she would become preoccupied with those thoughts.  Dr. Jen had prescribed mother various medications. Mother had received one dose of an Abilify shot, which Dr. Jen reported was not as effective as she hoped but mother was due for another shot.  In December 2024, mother attended a well-child check with minor and the foster parent.  The nurse practitioner reported that mother's behavior was very erratic and she perseverated for over 20 minutes about minor's past imaging. The nurse practitioner had significant concerns about mother's ability to care for minor without support.

Mother denied having a substance use issue.  Medical records from 2023 indicated that, at that time, mother "endorsed regular methamphetamine use."  Shortly after minor's November 2024 removal, mother tested positive for methamphetamine and she admitted to using.  In December 2024, her test results were negative for drugs but positive for alcohol.  Multiple tests in January 2025 were negative for all substances. But she tested positive for methamphetamine on February 10, 2025 and missed multiple tests thereafter.  Regarding her test results, mother initially

---

[3] The petition also included allegations against minor's father.  Father's reunification services were terminated at the six-month review hearing.  He is not a party to this writ proceeding and we do not include facts pertaining to him.

denied using any substances. She also reported that she did not realize she could not drink alcohol and she stopped drinking once she was told that she was positive. But she had previously stated she was not drinking alcohol or even caffeine. Eventually, mother admitted to using due to stress but maintained that she did not have a substance use problem. In early-March 2025, mother completed a mental health assessment with Homeless Prenatal Program and was awaiting assignment of an individual therapist.

Mother consistently visited minor and loved and cared for him deeply. Leading up to the jurisdiction and disposition hearing, mother had begun dyadic therapy with minor and a clinician from A Better Way, which was going well. The Agency recommended that reunification services be offered. Its concerns included whether mother was forthcoming, or aware, of her past psychiatric history and reason for being asked to take medication after minor's birth; mother not being forthcoming about her past drug use; and her ability to meet minor's needs when not in a structured environment. The Agency noted that mother was high functioning in many ways and could follow through on recommended services. It wanted to assess her participation and consistency in mental health treatment to ensure she could make a lasting behavioral change.

The Agency filed an amended petition amending allegations made pursuant to section 300, subdivision (b)(1). The amended petition alleged: mother had a history of psychosis and current mental health issues requiring further assessment and treatment, and which caused her to become overly preoccupied with aspects of minor's care and impeded her ability to comprehensively care for minor; and mother had a history of polysubstance abuse to cope with stress after minor's removal, including admission of

4

methamphetamine use, and she was drinking alcohol which, combined with her other issues, posed a risk to minor's health.

At the March 2025 contested jurisdiction and disposition hearing, the juvenile court sustained the allegations in the amended petition, declared minor a dependent, removed him from the parents' custody, and ordered reunification services. Mother's required reunification services were: a psychological assessment, continued monitoring by her psychiatrist and medication compliance, participation in both individual therapy and dyadic therapy with minor, a substance use assessment, random substance use testing, and signing releases of information.

## B. First Reunification Period (March to October 2025)

During the initial reunification period, mother struggled to comply with her case plan. She lived in an apartment and received CalWORKS benefits. She wanted to return to work after being unemployed for eight years. She was assigned a CAFE[4] provider. Despite her services, mother continued to require additional support due to ongoing challenges with following up on services and connecting with providers.

Mother had self-reported diagnoses of post-traumatic stress disorder (PTSD), anxiety, and depression. In May 2025, mother contacted the hospital reporting high levels of anxiety, auditory hallucinations, and an inability to leave her apartment. Yet she continued to minimize her mental health symptoms. In June 2025, Dr. Jen reported she was still working with mother, who had previously been attending two sessions a month but had recently been inconsistent with follow up. Mother stated she did not need a mood stabilizer as she had not been diagnosed with schizophrenia or bipolar disorder. In September 2025, Dr. Jen explained to the social worker that

---

[4] Court-Appointed Family Engagement specialist.

mother was "very confusing diagnostically." She expressed possibility that mother's challenging behavior since minor's removal may have just reflected a use disorder combined with difficulty building trust with providers. By October 2025, Dr. Jen had not seen mother for several months, even though mother had reported she met with Dr. Jen once a month.

Mother completed a psychological assessment in July 2025. The recommendations were: continue her medication regimen, individual therapy, education on how substance use impacts parenting, receive help to develop effective coping strategies to reduce substance use, and receive help with housing, childcare, employment and parenting skills. Throughout the assessment process mother minimized her psychological symptoms. Despite being referred to and connected with mental health providers, because mother failed to maintain timely contact with them, she did not begin individual therapy until September.

Mother reported no substance use but she failed to test consistently. From April to early-August 2025, mother missed 23 tests. It took her until July 2025 to complete a substance use disorder assessment, which noted she tended to minimize the severity of her mental health condition. The assessment concluded mother did not meet medical necessity criteria for treatment. But the psychological evaluation mother completed that same month advised that mother would benefit from receiving education on substance use.

In August 2025—shortly before the six-month review hearing—mother entered Epiphany Center's residential treatment program. Mother had completed a second substance use disorder assessment and Epiphany Center confirmed mother met the necessity criteria for treatment. Mother acknowledged she had been dishonest and admitted to using

methamphetamine, although she stated her use was occasional and not severe. The assessor, though, commented that it appeared her use was more frequent than disclosed, as discussions suggested a pattern of heavier and more consistent methamphetamine use over the past several months. The assessor noted that mother had not been mandated to enter treatment and was voluntarily seeking help, acknowledging that she could not overcome her substance use on her own. The assessor stated mother demonstrated a high potential for continued use if not engaged in a structured treatment program. At the initial calling of the six-month review hearing on September 2, 2025, the juvenile court scheduled a contested hearing. Shortly thereafter, mother left Epiphany Center, stating her dog had almost died after overdosing while in someone else's care.

Mother participated in dyadic therapy with minor, regularly attended visits, and cared deeply for him. She continued to express concern regarding minor's head size and sought support from the dyadic therapist about obtaining a helmet for him. Initially, mother appropriately engaged with minor during visits, but starting in June her involvement declined and she appeared tired and fatigued, at times falling asleep. Mother reported tiredness due to difficulty sleeping and stated that her medication affected her alertness. She required considerable assistance to care for minor during visits. By October, mother seemed more alert after a change in her medication but still seemed tired during visits. Mother had also cancelled some visits.

In its reports submitted for the six-month review, the Agency explained that mother had made limited progress on her case plan and was inconsistent with services. The Agency recommended the juvenile court terminate reunification services.

## C. Six-Month Review Hearing

At the six-month review hearing on October 24, 2025, the juvenile court heard testimony from various witnesses—including mother, Dr. Jen, and the social worker—and admitted exhibits into evidence. The court found return of minor to the parents would create a substantial risk of detriment. It also found a substantial probability that minor would be returned to mother's custody by the 12-month review date. Therefore, the court continued mother's reunification services. The court ordered mother to enter residential treatment.[5] The court continued mother's supervised visitation, giving the Agency discretion to progress to monitored and unsupervised visits based on whether she entered a residential treatment program, maintained her sobriety, and did not miss drug tests.

## D. Second Reunification Period (October 2025 to February 2026)

The Agency's status review report filed December 18, 2025, demonstrates that mother continued to struggle in the weeks following the six-month review hearing. She did not meet with the social worker despite the social worker making several attempts. She did not provide any information verifying she was taking her medication or meeting with her providers. She continued to minimize her substance use. The Agency reported she "ha[d] not made any progress since the last court hearing."

Dr. Jen did not hear from mother until one month after the six-month review hearing. Mother reported to her that she had been taking her

---

[5] We observe that the juvenile court's findings and order filed after the six-month review hearing does not include an order that mother enter residential treatment, and the record does not contain a reporter's transcript from that hearing. Based on statements made by mother in her petition, the Agency in its subsequent reports, and the court at the 12-month review hearing, it appears undisputed that the court made such order.

medication, had just run out the prior day, and asked for a refill. Mother's individual therapist had not heard from her in two weeks. She had missed her last visit in October and had not been in contact since then, despite the therapist's making several attempts for assessment. She had previously been participating in dyadic therapy through referral with A Better Way, but as of late-November, she had not yet engaged with the newly assigned clinician. Mother had not been drug testing.

During this reporting period, mother texted the social worker that her aunt had a stroke and she needed to be with her family. Then, on November 17, 2025, mother texted the social worker that she had relapsed and was going to enter detox and then go to Women's HOPE. A few days later, mother's case manager confirmed Women's HOPE had an available bed and she was helping mother find accommodation for her dog. For visits from mid-October to mid-November, the social worker confirmed mother had participated in some visits and had cancelled at least one. Mother cared deeply for minor.

In its first addendum report, filed December 24, 2025, the Agency provided the following updates: On December 1—five weeks after the six-month review hearing—mother entered Women's HOPE residential treatment program. Even a couple weeks into mother's stay, the social worker had difficulty communicating directly with mother and meeting her in person. The social worker eventually met with mother, who signed her case plan. The social worker advised mother the Agency's recommendation was to terminate services, and mother replied there was no reason to be there if she was not going to get minor back.

Dr. Jen met with mother at Women's HOPE and reported that mother expressed a commitment to staying in the program and demonstrated insight

9

into the need for support with her mental health and substance use issues. Mother had still not met with her assigned individual therapist. Instead, she began working with a therapist at Women's HOPE. Dyadic therapy had not resumed. Mother's drug tests at Women's HOPE were negative. Visits with minor were moved to Women's HOPE. At the initial calling of the 12-month review hearing in January 2026, the matter was continued for a trial beginning February 6, 2026.

In its second addendum report, filed February 4, 2026, the Agency recommended that the juvenile court terminate reunification services and set a section 366.26 hearing. The Agency provided the following updates:

Dr. Jen had met with mother three times in December and January. Mother was taking three medications and would be starting a fourth. Dr. Jen reported that mother showed insight into needing help with her mental health and substance use problem. They were still working towards diagnoses. There had been times where mother's reality testing was unreliable. Currently, she was reality-based in her perceptions. Dr. Jen explained that methamphetamine use can cause reality testing deficits so the fact that mother had them was non-diagnostic and the problems might not recur with abstinence. Dr. Jen felt mother was working towards a realistic goal of being a safe parent.

During a visit with minor on December 29, 2025, mother expressed hope that minor would be returned to her at the upcoming court hearing. She stated she felt confident, explaining she was enrolled in a drug treatment program despite believing she did not need it because she does not use drugs. During a meeting with the social worker in December, mother questioned why she was in residential treatment if she would not regain custody of minor. When she met with the social worker in mid-January 2026, mother

10

reported she was taking her medication and doing great. The social worker explained that mother "continue[d] to state that she does not know why she is in a program."

Mother did not maintain sobriety while at Women's HOPE. The Agency allowed mother to test at the program instead of the Agency's designated lab. Her tests in December 2025 were negative for drugs and alcohol. However, in January 2026, she tested positive for THC and negative for all other drugs and alcohol. Women's HOPE sent the sample to a lab for confirmation, and the lab report came back negative for THC but positive for alcohol. Eventually mother reported she used another person's vape pen. Mother did notify the social worker she had tested positive for alcohol. Based on the test results, beginning January 9, mother entered a 30-day growth opportunity contract which allowed her to leave only for appointments and required her to bring another person. In late-January, mother tested negative for all drugs and alcohol.

The Agency expressed concerns with Women's HOPE's communication and transparency. It did not appear that Women's HOPE was testing mother weekly. The Agency learned two weeks after the fact that mother tested positive for THC. Mother, not Women's HOPE, informed the Agency she had tested positive for alcohol. Women's HOPE did not timely disclose that mother was put on a contract after testing positive. The social worker had allowed mother to test at Women's HOPE instead of at the Agency's lab because Women's HOPE had confirmed mother would test weekly, test results were accurate, and it would provide the Agency weekly results. In late-January, mother resumed testing at the Agency's lab instead of Women's HOPE. On January 30, mother left the social worker a voicemail. Mother stated she had found out from her case manager that the social worker was

11

"making a big deal" about two tests but that the tests were not accurate. Mother stated twice that there had been two positive tests but claimed they were not positive. Mother was not sure what the social worker was "trying to do" or why she was "trying to make these . . . false positives a positive," but she was calling her attorney. The social worker questioned why mother would be on a 30-day contract if she had not tested positive.

Mother's therapist at Women's HOPE reported that they had been working together for one and a half months on safety, stabilization, and accountability. But mother was still in the assessment process. The therapist reported mother needed prompts to manage her daily living skills. The therapist advised it would be helpful to have a copy of mother's prior psychological evaluation, but mother would not consent to release it until after trial. Later, though, mother's attorney informed the social worker that the therapist indicated she did not need the evaluation to work with mother. The dyadic therapist met with mother twice in January during which mother did well with minor and was receptive to the therapist's feedback. Her visitation also went well. She was engaged and attentive.

There had been a delay in mother entering a residential treatment program following the six-month review hearing. Mother had previously reported the delay was because her aunt had suffered a stroke and might not survive. But the aunt informed the social worker that the information about her health was not true, her niece was lying, and she had not seen her niece in a long time.

Overall, the Agency recognized mother had started to participate in services. But there were ongoing concerns regarding her mental health which had not been fully addressed. Her therapy had been delayed due to changing therapists when she entered Women's HOPE where she was still in

the assessment phase. Mother would not consent to release her psychological evaluation to her therapist. Once mother left Women's HOPE, she would need to reestablish services with her prior therapist, disrupting continuity of care. The lack of a permanent provider delayed addressing the core mental health concerns.

The Agency was also concerned about mother's minimization of her substance use and understanding of why she was in residential treatment, as she had questioned why she was there if she would not get her son back. She had relapsed while in treatment. Finally, the Agency was concerned with mother's lack of communication and transparency, including instances of dishonesty. It could not confirm mother's commitment to reunification given her limited follow-through and lack of openness with the Agency.

The Agency recommended that the juvenile court terminate reunification services and set a section 366.26 hearing.

### E. 12-Month Review Hearing

The contested 12-month review hearing was conducted over three days in February 2026. The juvenile court admitted into evidence exhibits submitted by the Agency and mother and heard testimony from six witnesses.

The social worker testified that the only update since her last report was that she had received a letter via text from mother, but it did not change her recommendation. One of her biggest concerns was that mother did not admit she had a substance abuse problem. She did acknowledge that Dr. Jen and mother's therapist at Women's HOPE both reported that mother had accepted and acknowledged that she had drug problem. Recently, mother acknowledged to the social worker that she had a drug problem. The social

13

worker also expressed concerns about mother's history of psychiatric illness and issues communicating with mother.

The social worker acknowledged that mother had been participating in the program at Women's HOPE. At the time of the hearing, the social worker believed mother was trying to be open and forthcoming. Mother had recently admitted that she lied about needing to be with her aunt, admitting she was using drugs at the time. The social worker acknowledged mother took responsibility for her actions. She testified it was a good step that mother was now taking ownership of her substance abuse. In addition to words, she needed to see consistent actions.

Mother testified that she was still at Women's HOPE. She delayed in entering residential treatment because she "was overwhelmed by the trial" and had to find care for her dog. Mother admitted she lied when she said she had to care for her aunt who had a stroke, which she told the social worker because she was scared and did not want to meet her. She did not meet with the social worker because she felt uncomfortable speaking with her and got anxious.

Mother testified that at Women's HOPE she had a supportive community and was able to get help through counseling. She had been in denial of her substance use disorder and it took her awhile to admit she had a problem. When asked, "As you sit here now, would you say that you have a substance abuse problem?" she replied, "I think I am in recovery, and I am trying to recover from a substance abuse disorder." Another time, when asked if she had a substance use disorder, she replied, "Yes."

Regarding the January 2026 test results, mother testified she had not used THC. Her friend suggested she try a flavored vape pen to relieve stress, but she was not familiar with vape pens that had marijuana in them. She

thought it was tobacco. Regarding the positive alcohol test, she admitted to drinking beer when she was out of the residence on a pass. When asked how much, she initially said she drank "some beer." When questioned further on cross-examination, she testified she "just was drinking beer" and did not recall "the exact amount." But she then stated she drank "maybe one" or "[m]aybe two beers." The positive alcohol test led to the 30-day freeze.

Mother testified she had changed her behavior since entering Women's HOPE. She accepted she had a problem and needed extra support. She was aware that while she was using substances she was not herself and not a safe place for her son. She no longer wanted to drink alcohol. She met with her therapist once a week for individual sessions and her therapist also ran classes. She was being honest in therapy for the first time in her life. She recently began working with the dyadic therapist. She saw her psychiatrist, Dr. Jen. Mother testified she has a mental health problem and suffers from PTSD, anxiety, and depression. Her medications helped her.

Mother was ready for minor to be returned to her. She wanted him to live with her at Women's HOPE, where she had a strong support system. If minor was returned, after she completed Women's HOPE's program she wanted to enter another program for women and children to continue receiving support. Mother testified she was a different person from when minor was removed in November 2024. She was no longer in denial of her substance use disorder and was no longer having manic episodes or suffering from psychological imbalances.

Women's HOPE's program director testified Women's HOPE is a women and children's program which provides services to clients for substance use disorder and mental health, to support them with reunification. Mother was engaged and respectful and the director did "not

have red flags on [her]." Mother had demonstrated trust in the Women's HOPE therapist she worked with. They monitored mother's medication and were in contact with Dr. Jen.

Women's HOPE drug testing collects urine in specimen cups which indicate positive or negative results based on whether lines appear for specific drugs. If there is a positive result and the client denies use, they send the sample to a lab. Mother had tested positive once since she was there. On January 8, she tested positive for THC and negative for everything else. Mother denied using THC so they sent the sample to their lab, which returned results that were negative for THC and positive for alcohol. The next day, the director personally tested mother because mother was upset and denied THC use, and she again tested positive for THC. When the positive alcohol result came back, mother admitted "having a sip of alcohol." When the director asked mother about the positive THC results, mother told her she used a peer's vape which she thought was nicotine and it could have been in the vape. Mother never tested positive for methamphetamines while at Women's HOPE.

The director considered the test results as a relapse from alcohol, because the lab result came back negative for THC. On cross-examination, the director agreed that a relapse is a red flag and that mother's positive alcohol test result would be a red flag. After that positive alcohol result, mother was placed on a 30-day growth opportunity and given a wellness recovery action plan because she needed additional support. She was not allowed out of the facility on her own during that time.

The director confirmed that minor could reside with mother at Women's HOPE and she did not have concerns about minor being in mother's care. Mother appeared to the director to be oriented to time and place and to

16

be emotionally regulated.  She had acknowledged she had a substance abuse problem.  She had made positive progress in her two months there: she was not in denial about her challenges, was being open, asked for support, was on time for groups, and was positive.

Dr. Jen, mother's psychiatrist, testified she began working with mother towards the end of her pregnancy and had been treating her since then.  She gave mother's diagnoses as chronic PTSD, episodes of major depressive disorder, and methamphetamine use disorder in remission.  Chronic PTSD leads to hyperarousal symptoms, such as constant nervousness and hypervigilance, and confusion between present events and emotionally similar past events.  There is a blunted sense of the future and challenges processing new information.  She prescribed mother medication for symptoms related to her chronic PTSD and episodic major depressive disorder, and mother was taking them since entering Women's HOPE.

Dr. Jen explained that her understanding of mother's mental health evolved over time.  Initially, she did not correctly measure how much mother's PTSD led her to mistrust medical providers and care.  There were months where mother said she was taking her medication, but Dr. Jen did not think she was; and there were times when mother said she would come to an appointment but did not.  In the past six months, and particularly while she was at Women's HOPE, there had been a shift in mother's ability to trust providers, as the program's staff modeled trustworthiness and empathy.  This allowed mother to look back on her other providers' efforts in a more positive and trusting light.  Since entering Women's HOPE, mother had more successfully collaborated with Dr. Jen regarding her mental health.

Dr. Jen had no reason to believe that it would not be safe for minor to be with mother at Women's HOPE.  Dr. Jen explained that in mother's

17

episode in November 2024, mother was unable to see minor clearly. When mother was "functioning independently, she has enough trauma systems for [Dr. Jen] to be unclear whether she would continue to be able to see him and his needs distinctly and clearly." But, given the shift in the program, mother had developed an ability to trust input regarding assessing minor's needs and present condition. When mother was at Jelani House with minor and later at Epiphany Center without him, she was unable to accept that support. Now she could. Dr. Jen's "only concern" was that previously, when mother became stressed and anxious due to her desire for minor to be healthy, it undermined her reality testing at that time. Finally, mother's reality testing in contexts other than parenting was good.

Dr. Jen testified mother had made significant progress in her mental health and drug disorder. Regarding mother's relapse—whether it be with THC or alcohol—Dr. Jen testified she did not know whether it was significant. It did not negate the progress mother had made. It would have been more significant if it had been methamphetamine.

Minor's SafeCare nurse testified she did the parenting program with mother, who she began working with in December 2025. The interactions between mother and minor were great. Mother nurtured and played with him. When mother attended minor's medical appointments, she engaged with the providers. During an appointment that minor was having for an orthotics fitting—which had just occurred the week before the trial—minor's SafeCare nurse asked about minor "needing his helmet because [mother] asked [her] to look further into it." The paperwork was unclear whether he still needed it. She explained minor had been prescribed a helmet when he was younger.

After the evidence was presented, the Agency confirmed its recommendations that minor not be returned to mother, reunification services be terminated, and the court set a permanency plan hearing. Mother argued the Agency failed to meet its burden of showing that returning minor to mother would create a substantial risk of detriment and requested minor be returned to her custody. If not, mother requested services be extended to the 18-month review, arguing there was a substantial probability that minor could be returned to her custody and safely maintained in her home by then. Mother was addressing both her mental health and her substance use and had accepted that she has a substance use disorder. Minor's counsel requested the juvenile court reject the Agency's recommendations and extend mother's services.

## F. Juvenile Court's Ruling

The juvenile court found that the return of minor to mother's custody would create a substantial risk of detriment to minor. As to extending services, the court found that there was not a substantial probability that minor would be returned to mother and safely maintained in her home by the 18-month date, which was just three months away, in May 2026. Specifically, based on the evidence, the court could not find that mother had made significant progress in resolving the problems that led to minor's removal or that mother had demonstrated the capacity and ability to complete the objectives of the case plan and provide for minor's safety. The court terminated reunification services and set a section 366.26 hearing for June 10, 2026.

The juvenile court provided a reasoned explanation for its decision. The court explained that mother had minimized her substance use issue. Before the six-month review, she entered Epiphany Center but by the time

19

the hearing was held she had left saying she needed to care for her dog. Mother acknowledged she had been untruthful with herself and the Agency. The court then ordered her to attend and complete residential treatment and she waited many weeks before doing so. In that time, she relapsed and was not in touch with the social worker. When she did enter treatment in December 2025, one month into it she said she did not need residential treatment because she did not use drugs. She also told the social worker there was no point being in treatment if she was not going to get her son back. Over one month into the program, mother relapsed on alcohol and possibly THC. The court found her testimony about the amount of alcohol she drank evasive and her explanation for testing positive for THC not credible. After carefully observing mother on the stand, the court found that her admission to having a substance use disorder seemed "forced." Having observed both mother and the social worker, the court also discredited mother's explanation for not communicating with the social worker because she was uncomfortable with the social worker, who made her anxious.

Moreover, the juvenile court explained that even if it accepted mother's explanations for not communicating with the social worker and not entering treatment sooner, it found mother's extreme anxiety continued to interfere with her ability to make decisions to keep minor safe and to complete the objectives of her case plan. The court acknowledged that it was an important step that mother testified she has a substance use disorder and was in treatment. But since the case commenced in November 2024, mother had not demonstrated that she can achieve sobriety and maintain it for any sustained time. She was still in denial and lacked insight about the extent of her substance use issue.

Regarding mother's mental health, the juvenile court explained that during this review period there had been a time where mother was not in touch with her psychiatrist. And she switched therapists midway through. Dr. Jen testified about mother's progress but the court explained she did not grapple with mother's substance use history and continued use. The court gave demonstrations of why mother was continuing to experience mental health issues that interfered with her ability to safely parent minor.

The juvenile court acknowledged that mother loved minor and participated in her visits. But it explained that while there had been "quantitative progress," there was "insufficient qualitative progress." The court reasoned there is a difference between doing the services and actually internalizing the lessons and learning how to change behavior. The court found minimal behavioral change even after one year of services.

Mother timely filed a notice of intent to file a petition for extraordinary writ, and on April 9, 2026, she filed her petition challenging the order terminating services and setting the section 366.26 hearing. We issued an order to show cause why relief should not be granted. The Agency filed a response contending the petition should be denied.

## II. DISCUSSION

Mother argues that substantial evidence does not support the juvenile court's finding that minor could not be returned to her custody by the 18-month date and, therefore, the order terminating her services was error. We disagree.

"When a child has been removed from a parent's custody, the court ordinarily must order child welfare services designed to facilitate the reunification of the family." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624.) For children under the age of three at the time of removal, as here,

21

parents are presumptively eligible for six months of services.  (*Id*. at p. 625; see also § 361.5, subd. (a)(1)(B) ["services shall be provided for a period of 6 months from the dispositional hearing . . ., but no longer than 12 months from the date the child entered foster care"].)  At the six-month review hearing, if the juvenile court finds there is a substantial probability that the child may be returned to their parent within six months, the court must continue the case to the 12-month permanency hearing.  (§ 366.21, subd. (e)(3).)

At the 12-month hearing, if the juvenile court does not order the child to be returned to the parent's custody, the court must continue the case for up to six months—but no later than 18 months from the child's removal—only if there is a "substantial probability that the child will be returned to the physical custody of their parent . . . and safely maintained in the home within the extended period of time."  (§ 366.21, subd. (g)(1); *L.C. v. Superior Court* (2024) 98 Cal.App.5th 1021, 1034.)  To make a substantial probability determination, the juvenile court must find that the parent: (1) "has consistently and regularly contacted and visited the child;" (2) "has made significant progress in resolving problems that led to the child's removal;" and (3) "has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs."  (§ 366.21, subd. (g)(1)(A)–(C); *J.H. v. Superior Court* (2018) 20 Cal.App.5th 530, 535.)  If " 'the court does not return the child at the 12-month review hearing and finds there is no substantial probability of return to the parent within 18 months of the initial removal from parental custody, "the court must terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan." ' "

22

(*In re Damian L.* (2023) 90 Cal.App.5th 357, 371; see also *Michael G. v. Superior Court, supra*, 14 Cal.5th at p. 625 [reunification services are ordinarily provided for a maximum of 18 months from the child's removal].)

We review the juvenile court's findings for substantial evidence. (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150.)  " ' "To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value." ' " (*L.C. v. Superior Court, supra*, 98 Cal.App.5th at p. 1034.)  Under this standard, we do not reweigh the evidence or exercise independent judgment but review the record "in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders." (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.)

Here, the 18-month date would be May 13, 2026, three months after the 12-month review hearing.  The juvenile court could continue the case to that 18-month date only if it found a "substantial probability" that minor would be returned to mother's physical custody and safely maintained in her home within that extended period.  (§ 366.21, subd. (g)(1).)  The court found there was no such substantial probability because there was no evidence to find that mother made significant progress in resolving the problems that led to minor's removal (§ 366.21, subd. (g)(1)(B)) and demonstrated the capacity and ability both to complete the objectives of her treatment plan and to provide for minor's safety, protection, physical and emotional well-being, and special needs (*id*., subd. (g)(1)(C)).[6]  Substantial evidence supports these findings.

---

[6] It is undisputed that mother consistently and regularly visited minor, satisfying the first requirement.  (§ 366.21, subd. (g)(1)(A).)

23

Minor was removed based on sustained allegations related to mother's mental health issues and substance use issues with methamphetamine and alcohol. By the time of the challenged ruling, the dependency case had been ongoing for 15 months. Mother acknowledges that she struggled with addressing her issues in reunification services for more than one year after minor's detention. She used methamphetamine at various times between minor's removal in November 2024 and entering Women's HOPE in December 2025 while denying having a substance use issue. She did not maintain regular contact with her psychiatrist, was inconsistent in taking her medication and participating in therapy, and did not regularly drug test.

Following the six-month review hearing in October 2025, mother was mostly out of contact with the social worker and her providers for five weeks, despite being ordered to enter residential treatment and knowing that the Agency had already recommended the juvenile court terminate reunification services at the six-month review. She used methamphetamine during this time.

After delay, mother entered Women's HOPE residential treatment program on December 1, 2025. She admitted she lied to the social worker for at least one of her reasons for the delay—that her aunt had had a stroke. In late-December 2025—four weeks into the program—mother stated during a visit that she was confident minor would be returned to her because she was in a drug treatment program even though she did not use drugs. Around that same time, mother told the social worker there was no point in being in treatment if she was not going to get her son back. In January 2026—five weeks into the program—mother relapsed. The test results and the testimony surrounding them are confusing. There were positive test results for both THC and alcohol. At a minimum, mother admitted to drinking beer.

24

And her admission evolved over time: she told the program director she had a sip of alcohol; on the stand she was evasive about how much she drank, eventually testifying she had "maybe" one or two beers. This relapse required her to be put on a 30-day growth opportunity with the program, prohibiting her from leaving alone. The Women's HOPE director acknowledged that relapsing was a red flag. Two months into the program, and only one week before trial, mother left the social worker a voicemail complaining about the social worker making a big deal about false positive test results. These facts illustrate what the juvenile court described as mother's "denial and lacking insight about the extent of her substance use issue."

As to mother's mental health, the record supports the juvenile court's reasoning. Over the span of the dependency case, there were times when mother did not communicate with Dr. Jen or with the social worker, did not take her medication, did not participate in therapy, and used methamphetamine. While mother became more consistent in complying with her case plan requirements in the two months leading up to the 12-month review hearing, the court explained that Dr. Jen's testimony did not grapple with mother's substance use history and her continued substance use, including while in treatment. Dr. Jen testified that while she had no concerns for minor's safety in mother's care while she was at Women's HOPE, when mother was functioning independently, it was "unclear whether she would continue to be able to see [minor] and his needs distinctly and clearly." Dr. Jen expressed a concern that previously, when mother became stressed and anxious due to her desire for minor to be healthy, it undermined her reality testing. Mother continued to have anxiety over minor's health, including having her SafeCare nurse ask about a helmet at an appointment

25

the week before trial.  She did not cooperate with the social worker.  The record, therefore, supports the court's finding that mother continued to experience mental health issues which interfered with her ability to safely parent minor.

In sum, this evidence supports the juvenile court's findings that mother had not made *significant* progress in resolving the problems that led to minor's removal (§ 366.21, subd. (g)(1)(B), italics added), and that mother did not demonstrate the capacity and ability to complete the objectives of her case plan and to provide for minor's safety and well-being by the 18-month date (*id.*, subd. (g)(1)(C)).

Mother's arguments to the contrary are not persuasive.  She asserts the evidence demonstrates that she entered residential treatment, acknowledged she had a substance abuse problem and was committed to recovery, participated in psychiatric treatment and was medication compliant, actively engaged in individual and dyadic therapy, and submitted to drug testing.  This evidence was before the juvenile court.  Essentially, mother asks us to reweigh the evidence and reach a different conclusion.  But we may not reweigh the evidence or exercise our independent judgment.  (*Kevin R. v. Superior Court, supra*, 191 Cal.App.4th at pp. 688–689.)

Mother stresses her acknowledgement that she has a substance use problem.  The juvenile court—which had presided over the six-month and 12-month review hearings where mother testified—determined that mother's admission on the stand seemed "forced" and it was the court's role to make such determination.  (See *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1102 [it is within the purview of the juvenile court to determine credibility because it is uniquely positioned to reach a conclusion "based on its familiarity with the case and those involved"].)  Observing that mother also admitted to her

26

providers and the social worker that she had a substance use problem, we acknowledge it is an important step. But, given the evidence, it was reasonable for the court to conclude that mother had "not demonstrated that she can achieve sobriety and maintain sobriety for any sustained period of time." Mother is correct that she "was not required to demonstrate perfect compliance." (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1343.) But the record supports the court's determination that while mother made "quantitative progress," there was "insufficient qualitative progress." Accordingly, we reject mother's contention that the court's finding that there was no substantial probability of return by the 18-month date was supported "only by speculation and conjecture."[7]

## III. DISPOSITION

Mother's petition for extraordinary writ is denied on the merits. Her request for a stay of the hearing set under section 366.26 is denied as moot. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

---

[7] We note that at the 12-month review hearing, the juvenile court stated it would be open to considering a request to resume reunification services should mother continue to make progress, remain in treatment, and attain sobriety. We express no opinion on how the juvenile court should rule on any pending or future request.

27

_____
LANGHORNE WILSON, J.


WE CONCUR:


_____
BANKE, Acting P. J.


_____
SMILEY, J.


*D.E.-S v. Superior Court / A175680*